**STATE of Missouri, Plaintiff–Appellant,**

v.

**John Edward HENSLEY, Defendant–Respondent.**

No. 16049.

Missouri Court of Appeals, Southern District, Division One.

May 22, 1989.

Martin Mazzei and James A. Broshot, Steelville, for plaintiff-appellant.

Dan L. Birdsong and Thomas, Birdsong, Clayton & Haslag, P.C., Rolla, for defendant-respondent.

GREENE, Judge.

The State appeals from the trial court's order sustaining the motion of defendant, John Edward Hensley, to suppress items taken by state highway patrolmen from the person of Hensley and his companion, Jeffrey Weber, and from the vehicle in which the two men were sitting, which items the State intended to use in its prosecution of Hensley on a criminal charge of felony possession of cocaine. We affirm.

The burden of showing erroneous action on the part of the trial court is on the appellant. Error must be affirmatively shown, or appear by necessary implication. Conjecture and inferences will not subserve such a purpose. *State v. Harris*, 534 S.W.2d 516, 519 (Mo.App.1976). Keeping this legal principle in mind, we turn to the evidence adduced at the motion to suppress hearing, which evidence we view in the light most favorable to sustain the trial court's ruling.

On February 9, 1988, at approximately 8:40 p.m., Jeffrey Paul and Robert Proctor, officers with the Missouri State Highway Patrol, were patrolling Interstate 44 in Crawford County, Missouri. They were traveling in a westerly direction and were approaching the Route F overpass when they noticed a pickup truck parked on the shoulder of the north outer road. As the officers continued westbound, they saw the pickup's backup lights come on which indicated that it was backing down the highway. Although the troopers had no facts to indicate that the occupant, or occupants, of the truck were engaged in any criminal activity, they decided to investigate. As they were exiting on the ramp that lead to the outer road, the officers stopped to render assistance to some people whose car was parked on the F ramp overpass. The nature of the trouble and the assistance rendered are not disclosed in the transcript of the suppression hearing.

The two officers then proceeded to the north outer road until it intersected with a gravel road known as Daniel Road. After turning left on Daniel Road, they observed two vehicles, one a pickup truck and the other a passenger car, parked on the far right side of the road. There was no one in the pickup. Weber was in the driver's seat of the car, and Hensley was in the front passenger seat. At this point, Paul and Proctor got out of their patrol car "to see if there was anything else we could do for these people. We didn't know if they were stranded or broken down or what." Trooper Paul testified that at this point the troopers had no reason to believe that either Hensley or Weber had committed a crime.

As Paul and Proctor were approaching the passenger car, Paul noticed a shotgun in the back seat. The shotgun was a legal weapon, and the troopers knew there was nothing illegal in having a shotgun in open view in the back seat of an automobile. At this time, Weber and Hensley had gotten out of the passenger car. For safety's sake, Paul and Proctor decided to "pat down" the two men. The "pat down" was for the personal protection of the two officers, and was made to see if either Weber or Hensley were carrying concealed "[s]mall caliber weapons or handguns." Paul patted down Weber and Proctor patted down Hensley. During his pat down of Weber, Paul felt a bulge the size of a film canister in Weber's "right top pocket." The transcript does not indicate whether the pocket was on Weber's shirt or pants. Paul removed the canister, which he knew was not a weapon, from Weber's pocket. He opened it, sniffed it and smelled what seemed to Paul to be "the odor of marijuana." Proctor then patted down Hensley. During his pat down, Proctor felt a small round cylinder that he thought was a bullet in the left breast pocket of Hensley's shirt. Proctor removed the object, which turned out to be a small vial. He then opened the vial, which contained what he suspected to be cocaine. At some later unspecified point in time, Weber and Hensley were arrested. Hensley was then charged with felony possession of cocaine, in violation of § 195.200.1(1), RSMo 1986.

After his preliminary hearing, and following his circuit court arraignment, Hensley's attorney filed a motion to suppress the cocaine taken from his person, as well as "any other controlled substance." The motion alleged that:

1. The search and seizure were made without warrant and without authority. The initial stop of Defendant was without probable cause and, thus, the subsequent seizure was illegal.

2. The Defendant did not violate any law, either misdemeanor or felony, nor did he violate any municipal ordinance, in the presence of the officers, which would warrant the search or initial stop of the Defendant.

3. The arrest of the Defendant was not based on any reasonable and probable cause to believe that he had committed a felony.

4. The arresting officer had no knowledge that a felony had been or was about to be committed.

5. The search and seizure were not reasonably incident in time and place to any lawful arrest of the Defendant. The pat-down did not give the officer proba-

ble cause for a search of the Defendant's pockets and personal property.

6. The search was not reasonably necessary for the safety of the police officer in that the Defendant was already in custody at the time the search was made, and said search took place beyond the immediate vicinity of said arrest.

7. The Defendant did not consent to said search and seizure, and any consent which may be alleged was involuntary, a result of coercion inherent in Defendant's arrest and the presence and authority of the police officers, was given without Defendant first being informed of his right to remain silent, his right to the presence of an attorney, his right to have any [sic] attorney appointed for him if he could not afford one and his right to object to a warrantless search, and did not constitute a knowing, intelligent waiver of a known right.

8. Said search and seizure were the product, result and poisonous fruit of the unlawful confrontation set forth in the preceding sections of this Motion; the grounds for suppressing testimony concerning said confrontation set forth in the preceding sections are hereby incorporated by reference in this section.

9. The grounds herein enumerated make said search and seizure unreasonable, and violative of Article 1, Sections 15 and 19 of the Missouri Constitution, and of the Fourth and Fifth Amendments and the due process clause of the Fourteenth Amendment to the United States Constitution.

After an evidentiary hearing in which the evidence referred to above was introduced, the trial court made the following findings, conclusions, and orders:

The Court finds that Trooper Proctor and Trooper Paul testified that, at the time they approached the Defendant and Jeffrey Weber, the driver of the vehicle in which the Defendant was seated, they were not arresting either of said subjects for any crime and there was no probable cause to arrest them at that time. The Court finds that, as the Troopers approached Mr. Hensley and Mr. Weber,

they observed a shotgun in the back seat of the vehicle driven by Mr. Weber. The Court finds that the Troopers at that time felt it necessary to, and did, make a pat-down of Mr. Weber. The Court finds that in the pocket of Jeff Weber one of the Troopers found a round receptacle which was a film canister. The Trooper acknowledged that he did not believe the film canister was a deadly weapon or that it constituted any danger to him. The Court finds that the Trooper at that time made an illegal search of the canister by opening it and smelling its contents, which he discovered to be marijuana. The Court finds, as a matter of law, that the search of the film canister and the subsequent search of the contents of the pockets of John Hensley were not made pursuant to any probable cause existing at that time and place and were not a proper part of a pat-down procedure under the case of *Terry v. State of Ohio*, 392 U.S. 1, 29–30, 88 S.Ct. 1868, 1884–85 [20 L.Ed.2d 889] (1968). The Court finds that neither of the officers would be justified in concluding after the pat-down that what they felt in the pockets of Hensley and Weber were weapons; and, in fact, both Troopers testified and admitted that they did not believe that Hensley or Weber had dangerous weapons. The search conducted after that pat-down was illegal and without probable cause and not pursuant to any lawful arrest or consent to search.

WHEREFORE, the Court hereby suppresses all items seized from the person or vehicle of John Hensley or Jeffrey Weber, including, but not limited to, the drug cocaine, or any other controlled substance for the reason that such items were seized illegally and in violation of the Constitutional rights of the Defendant, John Edward Hensley.

The State appealed, claiming that (1) Hensley had no standing to object to the search of Weber's automobile, which presumably was done after the arrest of Weber and Hensley, (2) Hensley did not have standing to object to the search of Weber, and (3) the evidence found on the person of

Hensley was seized as a result of a valid stop and frisk.

We turn first to the issue raised in point three, as it is dispositive. That issue affects and controls the intended use by the State of all evidence seized from the person of Weber and Hensley and from the automobile the two had been sitting in, in any prosecution against Hensley.

Cornerstones in the state and federal constitutions are article 1, § 15 of the Missouri Constitution, and the fourth amendment of the U.S. Constitution, which amendment applies to state actions through application of the fourteenth amendment. Article 1, § 15 of the Missouri Constitution states: "That the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures...." The fourth amendment to the U.S. Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

■ There is no question as to the fact that the actions of Troopers Paul and Proctor in removing the objects in question from the pockets of Weber and Hensley and opening them, amounted to searches and seizures, which the State readily concedes. The only question is whether their actions in that regard were "unreasonable." If they were, the searches of Hensley and Weber were not authorized by law. Paul and Proctor had no warrants to either arrest or search Hensley or Weber. Warrantless searches or seizures are per se unreasonable unless there are special circumstances which excuse compliance with federal and state warrant requirements. *U.S. v. Kelly*, 529 F.2d 1365, 1371 (C.A.Mo. 1976). The only possible special circumstances excusing warrant compliance under the facts of this case would be a search conducted pursuant to a lawful arrest; *State v. McMahan*, 583 S.W.2d 540, 543 (Mo.App.1979), or a "pat down" search made pursuant to an investigative stop to see if the person being patted down has weapons on his person that he could use to harm the officer who made the investiga-

tive stop. *Terry v. State of Ohio*, 392 U.S. 1, 29–30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968); *State v. Singleton*, 560 S.W.2d 379, 382–83 (Mo.App.1977).

Troopers Paul and Proctor admit that neither Hensley or Weber were arrested prior to being searched, and that they had no probable cause to arrest either of the two men. Therefore, the State's claim of a lawful search must stand or fall on the application of *Terry* and Missouri cases such as *Singleton* to the facts at hand.

■ The articles taken from the pockets of Weber and Hensley were seizures after searches had been made of their bodies by Paul and Proctor. The scope of a search must be "strictly tied to and justified by" the circumstances which render its initiation permissible. *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782 (1967). Seizures made pursuant to a search such as was made here are limited to those that are reasonable. Because there is no ready test for determining reasonableness, there is a need to balance the search, or the seizure, against the invasion of the person's body which the search entails. *Camara v. Municipal Court*, 387 U.S. 523, 534–537, 87 S.Ct. 1727, 1733–1735, 18 L.Ed.2d 930 (1967). In justifying the particular intrusion, the police officer must be able to point to specific and articulable facts, which taken together with rational inferences derived from those facts, reasonably warrants the intrusion. Here, the State argues that the troopers had a "hunch" or "suspicion" that Hensley and Weber were drug dealers, and, therefore, a search of their persons was justified. Hunches and suspicions, even if acted on in good faith by the officers involved, are not enough. If subjective good faith alone were the test, the protections of the fourth amendment would evaporate, and the people would be secure in their persons, houses, papers and effects only in the discretion of the police. *Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964).

The only legal justification for a search of either Weber or Hensley, under the circumstances here, would be through the ap-

plication of the doctrine of *Terry*. In *Terry*, a Cleveland, Ohio police officer, who had a reasonable suspicion to believe that Terry and an accomplice were about to rob the proprietor of a store, patted down the two men, and, upon feeling objects through the fabric of the men's overcoat pockets that the officer believed to be weapons, removed the objects which turned out to be revolvers. Terry and his accomplice were then charged with carrying concealed weapons. In reviewing Terry's conviction, the Supreme Court of the United States, in recognizing that police officers need to protect themselves from possible violence at the hands of those they have briefly detained for questioning, even in the absence of probable cause to arrest those persons, stated that a search of those persons for weapons that might harm the officers had to be reasonable, and the authority for such a search had to be narrowly drawn. In deciding the case, the court stated:

> The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

> The scope of the search in this case presents no serious problem in light of these standards. Officer McFadden patted down the outer clothing of petitioner and his two companions. He did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. He never did invade Katz' person beyond the outer surfaces of his clothes, since he discovered nothing in his pat-down which might have been a weapon. Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general ex-

ploratory search for whatever evidence of criminal activity he might find.

> We conclude that the revolver seized from Terry was properly admitted in evidence against him. At the time he seized petitioner and searched him for weapons, Officer McFadden had reasonable grounds to believe that petitioner was armed and dangerous, and it was necessary for the protection of himself and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized. The policeman carefully restricted his search to what was appropriate to the discovery of the particular items which he sought. Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Terry*, 392 U.S. at 29–30, 88 S.Ct. at 1883–1885.

■ The facts of this case justified Troopers Paul and Proctor in making an investigative stop of Hensley and Weber, and making a limited pat down search of their bodies to see if either was carrying weapons that could be used to harm the officers.[1]

The question is, after they "patted down" the two men, and felt nothing that even remotely resembled a weapon, did they have any legal right to continue with

---

1. The evidence was that Hensley and Weber were sitting in an automobile parked on a remote country road. It was dark, the car's head-lights were not on, and there was a short barreled shotgun lying in the back seat.

their search and remove items from the pockets of Hensley and Weber and use those items as evidence in a subsequent prosecution of Hensley? The answer is no.

The state relies on *State v. Singleton,* 560 S.W.2d 379, 383 as its legal authority for a justification of seizing the vial from Hensley's pocket and the film canister from Weber's pocket, and using the contents of those containers as evidence in its prosecution of Hensley. Its confidence in the applicability of the holding in *Singleton* to the facts of this case is misplaced. The following statement appears in the *Singleton* opinion:

> While the sole justification for the 'pat-down' search pursuant to an investigative stop is to discover weapons that could be used for an assault, *Terry,* 88 S.Ct. at 1884, it is clear that other evidence discovered in the course of such a search can be seized. *Sibron [v. New York,* 392 U.S. 40], 88 S.Ct. [1889] at 1905 [20 L.Ed.2d 917 (1968)] (White, J., concurring) and 88 S.Ct. at 1910 (Harlan, J., concurring). The cameras found on appellant's person in this case were properly admitted into evidence.

Id. at 383.

While this holding was applicable to the facts in *Singleton,* the statement "it is clear that other evidence discovered in the course of such a search can be seized" is overly broad, and does not apply under circumstances such as we are dealing with in this case. In *Singleton,* the police officer in question had a legitimate purpose in searching Singleton for concealed weapons after an investigative stop made after the police had been alerted that Singleton was a suspect in a theft ring and was a drug addict. The officer observed Singleton entering an automobile and bending over, apparently reaching for something from the floor-board. The officer then ordered Singleton out of the car and frisked him. Several hard objects were felt at the waist area under the jacket Singleton was wearing. The hard objects which were removed by the police officer were cameras which had been stolen from a nearby department store, and which were used as evidence in Singleton's trial on the charge of stealing. In *Singleton,* the police officer had every reason to believe the objects he felt might be weapons, and he was justified in removing them from the person of Singleton. The fact that upon inspection the objects found were not weapons did not alter the officer's right to remove them from Singleton's person, and did not result in an unreasonable seizure so as to make their later offer as evidence tainted.

■ Here, Proctor and Paul knew, when they touched the objects in question through the clothing of Weber and Hensley, that they were not weapons which could be used to harm the officers. Since they had such knowledge, no reasonably prudent man could possibly be in fear that the vial in Hensley's shirt pocket that Proctor thought was a bullet, or the small film canister found in Weber's pocket by Paul, was a weapon that could be used by Hensley or Weber to endanger the safety of the two officers. *See, Terry v. Ohio,* 392 U.S. at 29, 30, 88 S.Ct. at 1883, 1885. Under those circumstances, and since the law enforcement officers had no warrant and were not making a search incident to a legal arrest for probable cause, the extraction of the film canister from Weber's pocket and the vial from Hensley's pocket, and opening those receptacles for further examination, amounted to an illegal search in violation of the state and federal constitution.

■ It necessarily follows that any subsequent search of the automobile was also illegal and that any evidentiary items found in the automobile, as well as those found on the person of Weber and Hensley, cannot be used in the prosecution of Hensley because they are tainted by reason of the initial illegal search and, therefore, are excludable as fruit of the poisonous tree. The state's argument that Hensley had no standing to object to the illegal search of Weber and the automobile has no validity since the items seized as a result of such searches were to be used by the State in its prosecution of Hensley. *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963).

The trial court's order sustaining Hensley's motion to suppress evidence is affirmed.

HOLSTEIN, C.J., and CROW, P.J., concur.