**STATE of Missouri, Plaintiff–Respondent,**

v.

**William T. JOYCE, Defendant–Appellant.**

**No. 18633.**

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 14, 1994.

Motion for Rehearing or Transfer
Denied Sept. 29, 1994.

Application to Transfer Denied
Nov. 22, 1994.

752

Donald L. Wolff, St. Louis, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Michael J. Spillane, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

CHARLES B. BLACKMAR, Senior Judge.

Route 66 of legend and song no longer traverses Missouri. Now we have Interstate 44, on whose broad divided lanes thousands of vehicles cruise daily. Some of those vehicles transport controlled substances of various kinds, even to the point that courts may take judicial notice that this route is often used by drug traffickers. *State v. Burkhardt*, 795 S.W.2d 399, 405[11] (Mo. banc 1990). Thus traffic officers are sentries in the war against drugs, and may properly investigate suspicious circumstances concerning people who are stopped for traffic violations or warnings. Because controlled substances are seldom displayed in the open, there is often tension between the officers' efforts and the Fourth Amendment. Lexis yields seventy-eight I–44 cases in the state and federal courts.

The defendant and Stephen W. Cartwright were charged with trafficking in drugs, second degree, in violations of § 195.223, RSMo Supp.1993. He moved to suppress as evidence the marijuana found in the vehicle in which he was riding, as did Cartwright, who was the driver. Both defendants agreed that the hearing on the motion to suppress would constitute the trial of the charges, and waived trial by jury. The court below overruled the motions to suppress and found both defendants guilty as charged. This defendant was sentenced to five years imprisonment, and prosecutes his separate appeal, relying solely on error in overruling the motion to suppress. We affirm. We, of course, accept the facts shown by the record which support the judgment, to the exclusion of conflicting evidence.

As I–44 enters the city limits of Springfield the speed limit drops from 65 to 55 miles per hour. Motorists notice little difference in the state of the traffic, and often overlook the signs which are regularly posted along the route. At 8:30 a.m. on January 30, 1990, Trooper Ron Replogle of the Missouri Highway patrol noticed from his stationary radar that an eastbound Buick Riviera with ski equipment on the top was traveling at a speed of 67 miles per hour. He followed the car for approximately one mile and then pulled it over by flashing his lights. He asked the driver, Cartwright, to walk with him to the patrol car. After both were seated in the car he explained that the speed limit was 55 and that the vehicle was traveling 67 miles per hour. Cartwright said that he had set the cruise control at 65 and was not aware that he was in a 55 miles per hour zone.

The trooper noticed that Cartwright appeared to be very nervous. He was out of breath, his hands were shaking, and he was talking loudly and rapidly. A driver's license

check showed that he was not a wanted person. The trooper issued a verbal warning, and then asked who owned the vehicle. Cartwright told him that the vehicle had been rented in Arizona by the defendant, who was also riding in the Buick. Cartwright said that the two were going to ski in Connecticut, that he did not know exactly where in Connecticut but the defendant knew, and that they planned to stop in Baltimore, Maryland. The trooper considered it unusual that the two would rent a car to travel to a ski area in Connecticut when they would have to pass well-known ski areas in Arizona, Colorado, and New Mexico on the way. He decided to make sure that the car was actually rented by the defendant.

The trooper then walked up to the passenger side of the vehicle to speak to the defendant, who produced an Arizona driver's license and rental papers from Alamo Rental showing that he had rented the car. The defendant told the trooper that he and Cartwright were going on a ski trip to Lake Placid, New York, and denied that the two had plans to stop in Baltimore. A glance at the Rand McNally Highway Atlas shows that Lake Placid is approximately 190 miles from the nearest point in Connecticut. The defendant was nervous and visibly shaking when he was speaking with the trooper.

Trooper Replogle testified that he suspected that the vehicle was transporting illegal controlled substances for a number of reasons, including the nervousness of the travelers, the implausibility of their stories, the inconsistencies between their respective accounts, and the known reputation of I–44 as a corridor for contraband. He returned to the cruiser and asked Cartwright for permission to search the car. Cartwright said that he had no authority to give permission for such a search, because the defendant was the lessee of the car. He, at first, said that he had ski equipment and clothing in the trunk, but then paused, denied knowing what was in the trunk, and said he had not been in it. His answers during this second conversation were slow and ponderous, in contrast to his previous excited speech.

The trooper returned to the Buick and asked the defendant for permission to search, which was refused. The trooper then returned to the patrol car and, at 8:42 a.m., called to request that a drug-sniffing dog be brought to the scene. He testified that if the defendant and Cartwright had asked to leave at this point he would have asked them to stay, but that they said nothing about leaving and so had no need to request them to remain. He testified that he believed that he had returned both drivers' licenses and the rental papers. He said that if the two wanted to leave he "probably" would have allowed them to do so.

Corporal Simmons of the Highway patrol arrived before the canine unit in an unmarked pickup truck with a camper shell on the back, which he parked behind Trooper Replogle's vehicle. This truck contained 440.88 pounds of marijuana which was being taken to Fair Grove, Missouri, for destruction. After Corporal Simmons arrived, Trooper Replogle walked the defendant and Cartwright to an area behind his patrol car. Trooper Dave Cash then came on the scene and parked his patrol car in front of the defendant's rental car.

Then the dog handler, Trooper David Henson, arrived with his narcotics dog, Wiko, at 8:52 a.m. He parked behind Corporal Simmons' truck. The defendant and Cartwright were asked to turn away from the Buick so that they would not see the dog's investigation of their car, and could not do anything which might distract the dog.

Trooper Henson testified as to his training with Wiko. Wiko was selected in Germany by George Mueller, assistant head of the canine department of the West German State Police, who conducted a six-week training course in Jefferson City beginning in September of 1988, in which Henson was trained with Wiko. The two also trained at the highway patrol academy on alternate weekends for one year, and attended a one-week training session conducted by Bernard Manley, another German training expert. Wiko was trained to detect the odors of marijuana, cocaine, methamphetamine, and heroin. Henson testified that Wiko had performed approximately 100 searches and had found drugs 20 to 25 percent of the time. Wiko had never alerted when a controlled sub-

stance was not present. The defendant produced expert testimony questioning Wiko's qualifications and training and, also, the methodology used in inspecting the Buick. The prosecution produced two experts in rebuttal, and both expressed the opinion that Wiko was a qualified search dog and that the procedures followed were appropriate.

After arriving on the scene Henson discussed the search with Replogle. While Wiko waited in the patrol car, Henson made eye contact with him and showed him a dog toy while standing near the Buick. This indicated to Wiko that he should sniff about the Buick. Replogle gave Wiko a heel command and he proceeded up to the Buick, passing the pickup truck and Replogle's patrol car. Henson was not aware that the pickup contained marijuana and Wiko did not alert on the pickup. Expert testimony demonstrated that he should not have alerted on the pickup because he was under heel command. Wiko sniffed around the Buick in a clockwise direction beginning at the right rear. When he reached the door on the driver's side, he began to react by moving his head back and forth, attempting to find the center of the scent. He became very intent as he reached the left rear wheel. He stuck his nose in the trunk seam and followed the seam across the trunk. At that point he began to bark, and to scratch, claw and bite at the trunk, actually taking off some of the paint. This was the way he acted when he found a substance he had been trained to detect, and his behavior indicated that one of the four substances was present in the trunk. Wiko was then given the toy as a reward. As Wiko walked back to Henson's car, he did not alert to the pickup truck. Henson testified that the dog did not alert because he had not been instructed to investigate the truck and because, after being given the toy, he was no longer interested in sniffing for drugs.

Trooper Replogle then asked the defendant for the keys to the trunk. A set of keys found in the glove compartment opened the trunk, which was found to contain two blue bags and two brown bags. The defendant claimed ownership of the blue bags, and Cartwright of the brown ones. Under the bags was a blanket and, underneath the blanket, six army duffle bags and one tent bag. The bags contained 59,939 grams of marijuana. After the marijuana was found, the defendants were arrested, advised of their constitutional rights, and transported to the highway patrol station.

■ We reject the defendant's first point, in which it is argued that after Trooper Replogle issued a speed warning to Cartwright the purpose of the traffic stop, which is a seizure under the holding of *State v. Hyland,* 840 S.W.2d 219, 221 (Mo. banc 1992), had been accomplished, and that any further questioning or detention was unlawful. Under the holding of *Burkhardt,* 795 S.W.2d 399, the trooper acted with entire propriety in checking Cartwright's driver's license, asking him about the ownership of the car and the purpose of the trip, and, after Cartwright told him that the defendant was the lessee of the car, in making the same inquiries of the defendant. Circumstances giving rise to "articulable suspicion" under the *Burkhardt* holding include (1) the known use of I–44 in transporting contraband from southwest to northeast, (2) the use of a rented automobile for a long journey, (3) the unlikely story about a ski trip to a remote area when other ski areas were much closer, (4) the nervousness of the occupants, and (5) the inconsistencies in their stories. The trooper, after completing inquiries, was justified in asking first Cartwright and then the defendant for permission to search their automobile.

■ There remains a question as to the continued detention of the defendant and his rented vehicle until the drug-sniffing dog could be brought to the scene. This case differs from *Burkhardt,* 795 S.W.2d 399, in which the officer, aided by a remark "blurted out" by the defendant, was found to have probable cause to search the trunk of the car she was driving, and proceeded to search after having received an equivocal answer to his request for permission to search. It also differs from *Hyland* and *State v. Bunts,* 867 S.W.2d 277 (Mo. banc 1993), because in those cases permission to search was voluntarily given. Here, the defendant and Cartwright exercised the right to refuse consent to the

search. Although Trooper Replogle testified that he had returned their drivers' licenses and that, had they asked, he would probably have allowed them to leave, we shall assume that the defendants reasonably believed that they would not have been permitted to get back in their car and leave the scene before the dog arrived. People would hesitate to act this way in the presence of the police. So we shall assume that there was a seizure either of the defendant's person or of the car, or of both. The refusal of consent to search is not a circumstance which could justify a detention which is otherwise unlawful. So we must decide whether the 10–minute period between the request for the dog and Trooper Henson's arrival with Wiko constitutes an unlawful seizure.

In *Bunts*, 867 S.W.2d at 280[8], this court said, "[T]he lawful character of a detention, and therefore seizure, may be extended if a new factual predicate for reasonable suspicion is found during the period of lawful seizure."

The opinion cited *Hyland* in support of its exposition. There the detention was for "ten to twelve minutes" following the initial stop. The court found that permission to search was requested and the defendant's consent given "within the time reasonably necessary to carry out the traffic stop, or as extended by the appearance of a reasonable basis for suspicion of other violations."

In *State v. Petrone*, 836 S.W.2d 484 (Mo. App.1992), the court held that a lapse of 12 minutes between the time of a traffic stop and the officer's request for permission to search is not an unreasonable period.

*State v. Childress*, 828 S.W.2d 935, 945 (Mo.App.1992), highlights as relevant "the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention," quoting from *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir.1988), *cert. denied*, 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989), and found that a detention for "a very few minutes, the specific number unknown," leading up to the trooper's search, was not unreasonable. The case commented on the inappropriateness of prescribing a bright-line rule, rather than relying on "common sense and ordinary human experience," citing *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985), which found that a 20–minute wait for a DEA agent was not unreasonable.

Thus the cases recognize the propriety of detention following an investigatory stop, based on "articulable and reasonable suspicion" of illegal activity. *Sharpe*, 470 U.S. at 682, 105 S.Ct. at 1573, 84 L.Ed.2d at 613, even though the circumstances do not afford probable cause for either an unconsented search or an arrest. No explicit time is specified in the cases, but the detention must not be prolonged.

*Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1982), upheld a lower court holding that a consent to search airport baggage was not voluntary when the defendant was taken from an airport gate to a small room for interrogation. The plurality expressed a decided preference for the use of a drug-sniffing dog to check the baggage, and suggested that officers with well-founded suspicions "could have detained Royer for the brief period during which Florida authorities at busy airports seem to be able to carry out the dog-sniffing procedure." This statement, of course, is dictum, but we believe that it represents an appropriate analysis and is consistent with other "dog" cases.

*United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the court held that a 90–minute seizure of the defendant's luggage while awaiting the arrival of a sniffing dog was unreasonable, in the absence of probable cause. The court pointed out that the officers could have proceeded much more expeditiously with a little advance planning. *United States v. Morales–Zamora*, 914 F.2d 200 (10th Cir.1990), holds that a sniffing by a dog is not a "search," citing *Place*, but the canine search proceeded while the officers were still inspecting documents. That case was cited in a case very close to this one, *$23,811.00 in U.S. Currency v. Kowalski*, 810 F.Supp. 738 (W.D.La.1993), in which a vehicle was stopped for having illegally tinted windows. The questioning of the

occupants gave rise to reasonable suspicion, and a drug-sniffing dog was sent for. The dog arrived 36 minutes after the initial stop. The court assumed, as we do, that the occupants were not free to depart with the vehicle. It found, however, that the officer acted with reasonable dispatch, and held that the detention was not unreasonable.

In cases not involving dog sniffs, *United States v. Borys,* 766 F.2d 304 (7th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986), holds that a detention of 45 minutes was "at the outer bounds of the Constitution," while in *Hardy,* 855 F.2d at 759, and *United States v. Alpert,* 816 F.2d 958 (4th Cir.1987), 50-minute detentions were found reasonable.

The defendant cites a recent opinion of the Eighth Circuit Court of Appeals, *United States v. Bloomfield,* 24 F.3d 1043 (8th Cir. 1994),[1] which also involved a driver who was stopped for a traffic violation, and a delay until a drug-sniffing dog could be brought to the scene. The delay was substantially longer than that shown by this record, but the case is undoubtedly attractive to the defendant because the majority opinion seems to hold that questioning following a traffic stop must be limited to the circumstances giving rise to the stop. Our cases hold that if the officer in the course of his duties perceives circumstances giving rise to a reasonable suspicion of law violation, the officer may investigate further. *See* particularly *Burkhardt,* 795 S.W.2d 399. The cases from the Supreme Court of the United States above cited support the *Burkhardt* holding. We believe that the dissenting opinion of Judge Magill in the *Bloomfield* case better accords with our law than does the majority opinion.

In *State v. Rodriguez,* 877 S.W.2d 106 (Mo. banc 1994), a truck pulled into a commercial vehicle weighing station. Because of certain suspicious circumstances the attendants, without advising the driver, called the highway patrol, and a trooper arrived in approximately 20 minutes, and while the inspectors were still checking the truck and papers. The trooper asked and received permission to search, discovering marijuana. The court found that there was no unreasonable search or seizure, and affirmed the conviction.

In line with the foregoing authorities we believe that the trial judge could properly conclude that the detention of the defendants and the vehicle in which they had been traveling was not an unreasonable seizure. The officers proceeded with dispatch. There is no indication of coercion or overbearing conduct. The dog offered a quick and unintrusive method for determining whether the trooper's reasonable suspicions were justified. We find that the limits of the Fourth Amendment were not transgressed.

■■■ The defendant argues in a separate point that the procedures which followed the issuance of the speed warning were "pretextual," in that they were not related to the traffic stop but were carried out solely in order to provide a basis for a search for drugs. *State v. Mease,* 842 S.W.2d 98, 106 (Mo. banc 1992), *cert. denied,* — U.S. —, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993), clarifies earlier holdings in stating with crystal clarity that police action is not pretextual if the officer does no more than the law expressly authorizes, and that a procedure is not pretextual simply because the officer may justifiably seek information about offenses in addition to and of a different nature from those which occasion the immediate detention. The trooper, after he stopped the Buick, discovered circumstances which justified further inquiry. *Burkhardt,* 795 S.W.2d 399; *Bunts,* 867 S.W.2d 277. We reject the claim of pretense.

■■■ We also reject the defendant's third point, in which it is argued that the dog Wiko was not shown to be adequately trained, and that the search procedure was flawed. The training matter was the subject of expert testimony by the defense and the prosecution. The conflict was for the trial judge to resolve. The state's evidence explained the dog's failure to alert on the marijuana in the pickup truck, because he was not directed to. The highway patrol might think it wise in the future if vehicles carrying contraband for destruction would proceed directly to their

1. The clerk's office advises us that this case is still pending in the Eighth Circuit Court of Appeals and that it will be reargued before the court *en banc* in September.

destination without stopping to aid other troopers, but the trial judge's finding that the search was not rendered invalid by the presence of the contraband in the evidence vehicle is supportable. The state's experts also testified that it was proper to display the dog's toy near the vehicle to be inspected. It is of interest that Wiko did not immediately charge this vehicle when the toy was displayed but checked the entire right side and front before beginning to react. The record does not support the intimation that Wiko alerted indiscriminately when he was asked to sniff for controlled substances. We find no basis for overturning the trial judge's finding that the canine procedure was reliable.

After Wiko alerted, the officers were justified in unlocking the trunk and searching the contents. When the marijuana was found the defendant and Cartwright were properly arrested. The defendant alleges no error other than the ruling of the motion to suppress.

The judgment is affirmed.

PARRISH, C.J., and SHRUM, J., concur.