Timothy C. FORD, D.P.M.; and Podiatric Associates, PLLC, Appellants/Cross–Appellee,

v.

William T. BEASLEY, D.P.M., Appellee/Cross–Appellant.

Nos. 2003–CA–000432–MR, 2003–CA–000508–MR.

Court of Appeals of Kentucky.

Oct. 15, 2004.

C. Thomas Hectus, Randall S. Strause, Hectus & Strause, PLLC, Louisville, KY, for Appellant/Cross–Appellee.

Bart L. Greenwald, Griffin Terry Sumner, Frost, Brown & Todd, LLC, Louisville, KY, for Appellees/Cross–Appellants.

Before BARBER, KNOPF, and TACKETT, Judges.

## OPINION

TACKETT, Judge.

Dr. Timothy C. Ford appeals an order of the Jefferson Circuit Court granting Dr. William T. Beasley's motion to enforce a settlement agreement. Ford and Beasley are podiatrists who decided to end their joint practice. The split was not an amicable one. Attorneys for the doctors reached a settlement agreement, but Ford refused to sign it, claiming that his attorneys had acted without his consent in entering into the agreement. The Jefferson Circuit Court granted Beasley's motion to enforce the agreement because the evidence indicated that Ford had given his consent to his attorneys, and because nonenforcement of the agreement would cause Beasley considerable hardship. Because the circuit court applied the proper case law, and its findings of fact were not clearly erroneous, we affirm.

Ford and Beasley decided to merge their practices to form Podiatric Associ-

ates PLLC (a professional limited liability company). They entered into an Operating Agreement to that effect in February 2000. The business relationship was not a success and Beasley decided to withdraw from the company. Disputes arose over how the assets and liabilities of the PLLC should be apportioned, and Ford ultimately filed a demand for arbitration to settle the matter. The arbitration was scheduled with the American Arbitration Association for January 23, 2002. On the day before the arbitration was to take place, however, attorneys for the two doctors negotiated the settlement agreement that is the subject of this appeal.

Stuart Adams, counsel for Ford at that time, met with Sheryl Snyder and Bridge Papalia, counsel for Beasley, on the morning of January 22, 2002, in a final attempt to arrive at a settlement. Their discussions were productive, and the negotiations continued by fax and telephone throughout the day. Adams and his associate, Todd Raderer, testified that they kept their client Ford fully informed of the negotiations as they progressed. An agreement was reached that evening. The provisions that were to provoke the most controversy afterwards were (1) the $25,000 cash to be paid by Beasley to release him from the PLLC; (2) the amount of money owed by Ford and Beasley to Chilton and Medley, the PLLC accountants; and (3) the so-called "hold harmless" language, which stated that Ford would hold Beasley harmless on his obligations as a personal guarantor of the PLLC. The arbitration scheduled for the next day was cancelled.

Ford refused to execute the settlement agreement, however, claiming that his attorneys had acted without his consent. In fact, he testified that he was not even made aware of the terms of the agreement until Adams sent him a draft in early February 2002. Finally, about ten months later, Beasley filed a motion in Jefferson Circuit Court to enforce the settlement. After conducting a lengthy hearing, the court granted the motion.

In arriving at its decision to grant Beasley's motion, the circuit court applied the test for determining when a client is bound by the actions of his or her attorney, as it was established by the Kentucky Supreme Court in *Clark v. Burden*, Ky., 917 S.W.2d 574 (1996). In that case, the Court balanced the right of a client not to be bound when his or her attorney acts without authorization and the rights of third parties who could potentially suffer harm if they had relied on that attorney's representations. The *Clark* court held that in "ordinary circumstances, express client authority is required [to enforce an agreement]." *Id.* at 576. Even if no such authority was given, however, an agreement may still be enforceable. The Court explained that "[a]t some point ... the client must be charged with responsibility for having employed an attorney who failed to observe the requirements of fidelity to the client's wishes. That point, we believe, is when the rights of innocent third parties are adversely affected." *Id.* at 577.

Based on this reasoning, the Court directed that a settlement will be enforced if the trial court determines that the party seeking to avoid enforcement gave his or her attorney express or actual authority to enter into a settlement; or, even if no such authority was given, the party seeking enforcement is "substantially and adversely affected" by their reliance on the purported settlement. *Id.* at 577.

When conducting the first part of the inquiry (as to whether the client has given settlement authority) the Supreme Court directed the trial court "to summarily decide the facts." *Id.* We therefore review the circuit court's findings of fact under the clearly erroneous standard, with due

regard for the opportunity of the trial court to judge the credibility of the witnesses. *See* CR 52.01.

After hearing extensive testimony from the parties and their attorneys, the circuit court found that Ford had given his attorneys express authority to enter into the settlement. The court concluded as follows:

Dr. Ford admitted in his testimony that he had been on the phone with his attorneys several, if not many, times throughout the day on January 22 and might have discussed a cash settlement amount. He also could not refute Mr. Raderer's statement testimony that various faxes concerning settlement terms were sent to his office that day. He admits to discussing the controversial "hold harmless" language of the proposed settlement agreement on January 22 with his former counsel. Without putting too fine a point on it, the Court simply finds it impossible to believe that Dr. Ford was unaware that all of these events were made in furtherance of a settlement. The Court is further inclined to believe that Dr. Ford indeed gave his attorneys authority to settle the case for $25,000.00, based on the circumstances of the case and the testimony of Messieurs Adams and Raderer.

■ We have reviewed the record and we conclude that the court's determination that Ford gave his attorneys authority to enter into the settlement was not clearly erroneous.

Ford cites as the most compelling evidence that Adams and Raderer failed to obtain his consent to the agreement the fact that the fax cover and confirmation sheets that would support their testimony that they had faxed letters containing offers and counteroffers to him during the negotiations were not in the original file they sent to him or in their copy of the file.

The absence of these sheets is not conclusive, however. Ford himself testified that faxes "were brought back and forth." Furthermore, Raderer and Adams testified that, in addition to sending the faxes, they spoke several times with Ford on the telephone that day to inform him of the progress of the negotiations.

Ford also explains that he could not possibly have agreed to the alleged settlement because he was afforded no opportunity to consult with his tax and financial advisors regarding the negotiated provisions and potential liabilities connected with the agreement. Consultation with such advisors prior to entering into an agreement may be wise, but the absence of such consultation is not conclusive evidence that Ford's attorneys lacked his consent to enter into the settlement.

Ford next argues that his attorneys failed to give him the essential information he would have needed to approve the final settlement.

Ford also contends that the provisions of the agreement were too vague to constitute a binding settlement. He refers to the fact that the amount of money that the PLLC owed to its accountants, Chilton and Medley, and the way in which that debt would be apportioned between Ford and Beasley, was deliberately left unresolved in the terms of the January 22 agreement. He also contends that a final settlement could not have been reached on January 22 because the provisions of the purported agreement were so vague that they continued to be negotiated long after that date. On these grounds, Ford insists that the settlement agreement could not have constituted a contract because its terms were too vague.

■ This latter argument differs, however, from the argument that the vagueness of certain terms of the agreement is

evidence that Ford did not give consent to his attorneys. On appeal, Ford raises for the first time the argument that the settlement is unenforceable due to its inherent vagueness, in addition to his earlier argument that the vagueness merely illustrates that he could not have given meaningful consent. The circuit court was never asked to assess the settlement agreement for vagueness under strict contract principles. This issue is therefore not preserved for appeal.

In reference to the argument that the terms were so vague that he could not possibly have consented to them, the terms were certainly clear enough that the attorneys for both parties and Beasley believed they had a settlement. Furthermore, the terms of the settlement were certainly clear enough to be strenuously objected to by Ford. We also agree with Beasley that the post-settlement negotiations between the attorneys addressed the crafting of the final settlement documents, not any changes to the material terms of the settlement.

Ford also challenges the circuit court's determination, as part of its inquiry under *Clark v. Burden,* that even if its finding that Ford's attorneys had express authority was erroneous, the agreement should nonetheless be enforced because Beasley would be substantially and adversely affected by its non-enforcement. That court explained,

> He [Beasley] has incurred great costs in terms of time and money; he has and will be forced to cancel surgeries and regular office visits; he will be forced to undergo repetitive discovery efforts; he will have to endure another demand for arbitration, and the time and expense that will incur. The emotional and mental stress of the situation is also not lost on the Court, which is fully aware that Dr. Ford has and will suffer

many of the same misfortunes. Looking to the letter of the law in *Clark,* though, the Court finds that not enforcing the agreement will work the type of hardship contemplated in that case on Dr. Beasley.

Ford nonetheless argues that any inconvenience resulting from nonenforcement of the settlement would be felt equally by both parties. While this may be true, the knowledge that Ford is also adversely affected does not objectively lessen the burden on Beasley.

Ford also contends that "any potential prejudice befalling the Appellee [Beasley] would be the result of his own negligence in ascertaining whether Adams and Raderer had express consent to settle." Ford insists that any harm suffered by Beasley is the result of Beasley's own failure to ensure that Ford himself had agreed to the settlement terms. Ford cites the case of *Fillhardt v. Schmidt,* Ky., 291 Ky. 668, 165 S.W.2d 155 (1942) in support of this proposition.

*Fillhardt* is clearly distinguishable, however. In that case, Arthur J. Daly, the attorney for the party in Beasley's position, had clear notice that attorneys for the opposing party were attempting to commit a fraud on their own clients by bringing about the dismissal of their cases. The opinion held that Daly and his clients could in consequence also be implicated in the fraud. The opinion states, "[i]f the adversary parties or their lawyer knew or in the exercise of reasonable diligence should have known of the absence of authority of the attorneys and cooperated with them in securing the judgments dismissing the cases as settled, they are chargeable with practicing fraud upon the attorneys' clients." *Id.* at 160. There were no allegations or evidence of a similar fraud in this case. Moreover, there is no indication that Beasley and his attorneys failed to

exercise reasonable diligence in determining that Adams and Raderer were operating under Ford's authority and had secured Ford's consent to the agreement.

█ We also note that shortly after Ford and Beasley decided to end their business relationship, Beasley filed a complaint in the circuit court to have Adams removed as Ford's attorney on the grounds of conflict of interest, because Adams had also represented the PLLC. Ford successfully contested the removal. If anything, Ford's strenuous attempt to keep Adams as his attorney would have indicated to Beasley and his attorneys that Adams had his client's full confidence.

█ Finally, Beasley argues on cross-appeal that the circuit court erred in refusing to award him his attorney's fees and the costs related to enforcing the settlement. The award of attorney's fees lies "within the sound discretion of the trial court and [the court's] decision will not be disturbed on appeal absent an abuse of discretion." *King v. Grecco*, Ky.App., 111 S.W.3d 877, 883 (2002). We see no abuse of discretion in the circuit court's decision not to award Beasley his attorney's fees.

For the foregoing reasons, the order of the Jefferson Circuit Court is affirmed.

ALL CONCUR.