**STATE of Missouri, Plaintiff–Respondent,**

v.

**Luke A. KEMPA, Defendant–Appellant.**

**No. 28014.**

Missouri Court of Appeals, Southern District, Division One.

Oct. 5, 2007.

Ellen H. Flottman, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Dora A. Fichter, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Judge.

Luke Kempa (Defendant) was charged by information with committing the class A felony of trafficking in the first degree by transporting 180 pounds of marijuana with the intent to distribute same. *See* § 195.222.7.[1] Following a bench trial, he was convicted and sentenced to serve 22 years in prison. On appeal, Defendant contends the trial court erred in denying a motion to suppress and in admitting evidence that, during a warrantless search of Defendant's vehicle, a highway patrol officer found five large duffel bags containing 178 pounds of marijuana. Defendant argues this evidence should have been excluded because the officer used a drug dog to sniff the exterior of Defendant's vehicle

after the initial traffic stop had concluded. We affirm.

## I. Standard of Review

At a suppression hearing, "[t]he burden of going forward with the evidence and the risk of nonpersuasion shall be upon the state to show by a preponderance of the evidence that the motion to suppress should be overruled." § 542.296.6; *State v. Franklin,* 841 S.W.2d 639, 644 (Mo. banc 1992). Therefore, the State bore the burden of production and burden of persuasion to show that the warrantless search of Defendant's vehicle was valid. *State v. Hampton,* 959 S.W.2d 444, 450 (Mo. banc 1997).

On appeal, our inquiry is limited to determining whether there is substantial evidentiary support for the trial court's decision to deny the motion to suppress. *State v. Edwards,* 116 S.W.3d 511, 530 (Mo. banc 2003). In making that determination, we consider both the evidence presented at the suppression hearing and the evidence introduced at trial. *State v. Deck,* 994 S.W.2d 527, 534 (Mo. banc 1999). The complete record before the trial court is viewed in a light most favorable to its ruling. *State v. Jackson,* 186 S.W.3d 873, 879 (Mo.App.2006). All contrary evidence and inferences are disregarded. *State v. Galazin,* 58 S.W.3d 500, 507 (Mo. banc 2001); *State v. Kinkead,* 983 S.W.2d 518, 519 (Mo. banc 1998).

We will not reverse the trial court's ruling unless the decision is clearly erroneous, leaving this Court with a definite and firm impression that a mistake has been made. *State v. Williams,* 97 S.W.3d 462, 469 (Mo. banc 2003); *State v. Newberry,* 157 S.W.3d 387, 397–98 (Mo. App.2005). We review issues of law *de novo. State v. Rousan,* 961 S.W.2d 831,

---

1. All references to statutes are to RSMo (2000).

845 (Mo. banc 1998). We give deference, however, to the trial court's factual findings and credibility determinations. *Id.* For this reason, "[t]he trial court may not be reversed if its decision is plausible, even if we are convinced that we would have weighed the evidence differently if sitting as the trier of fact." *State v. Davalos,* 128 S.W.3d 143, 147 (Mo.App.2004). The evidence and inferences contained in the complete trial record, viewed in the light most favorable to the trial court's ruling on the motion to suppress, are summarized below.

## II. Factual and Procedural Background

On December 31, 2004, Corporal Gary Braden (Braden), a road and canine officer with the Missouri State Highway Patrol, was on duty near the 51–mile marker on Interstate 44 (I–44) in Lawrence County. Braden was accompanied in the patrol car by his drug dog, Or. The dog had been trained to detect marijuana, methamphetamine, heroin and cocaine by smell.

At approximately 10:00 a.m., Braden was running stationary radar checks on eastbound traffic. The speed limit at that location was 70 m.p.h. Braden observed a 1991 Lincoln Town Car, which was being operated by Defendant, crest a hill in the passing lane. The vehicle was traveling 76 m.p.h. As the car passed by Braden, he noted that it had Arizona license plates. When Defendant re-entered the right-hand lane, the Lincoln's right tires crossed the fog line and traveled approximately one foot onto the shoulder two times within a few seconds.[2]

Braden pulled out and began following the Lincoln. While doing so, he ran a license plate check via radio and learned that the vehicle was owned by a Tucson, Arizona car rental agency. At around the 56½-mile marker, Braden activated his emergency lights. Most motorists would react immediately and pull over within one-fourth of a mile when that occurred, but Defendant did not do so. Braden could see Defendant watching the patrol car in his rear view mirror. Without slowing down, he drove completely onto the shoulder, pulled back into the driving lane and kept going. He then repeated this same maneuver. Because Defendant's conduct was so unusual, Braden contacted his superior officer and requested back-up because it did not appear that Defendant was going to stop.

Braden followed Defendant for about one and one-half miles. At mile marker 58, Defendant took the Halltown exit and stopped his vehicle on the right-hand shoulder midway up the ramp. Braden stopped his patrol car behind the Lincoln. Defendant immediately got out of his car and began walking toward Braden. This behavior was unusual because most drivers remain in their vehicles when stopped. In Braden's experience, exiting a vehicle indicates that the driver does not want the officer to closely approach the car because he might see or smell something in the vehicle.

Braden and Defendant met about halfway between their vehicles. The officer identified himself and explained the reason for the stop. He intended to give Defendant warnings for speeding and the lane violations. The weather was not very cold, and Defendant was wearing a long-sleeved shirt and shorts. He appeared to be very nervous. Braden noticed that Defendant's arms, hands and legs were visibly shaking. He also looked down at the ground and

---

**2.** The fog line is the white line on the right-hand side of the highway that separates the driving lane from the shoulder.

avoided eye contact with the officer. When Braden asked Defendant why it took him so long to pull over, he said there was debris on the shoulder of the road. Braden had not seen any such debris. Upon request, Defendant produced an Arizona driver's license and said the Lincoln was a rental.

Braden asked to see the rental agreement, and they walked up to Defendant's vehicle. While Defendant obtained the agreement from the glove box, Braden looked in the vehicle to make sure there was no one else inside. In the area of the front passenger seat, he saw a cell phone and a map of the United States. In the right-rear floorboard, he saw two un-opened containers of beer. On the rear passenger seat, he observed a small, un-zipped duffel bag with wadded-up blue jeans, shorts and t-shirts hanging out of it. Upon reviewing the rental agreement, Braden learned that the Lincoln had been rented in Tucson, Arizona, on December 28th and was due to be returned on January 4th. Braden asked Defendant to sit in the patrol car. As they were walking back, Braden inquired where Defendant was headed. He said he was going to St. Louis to attend a party and a wedding.

Upon entering the car, Defendant sat in the front passenger seat of the patrol car. The car was not cold, but Defendant's arms, hands and legs continued to shake. His voice was shaky, and he did not make eye contact. He continued to appear to be very nervous. Braden entered Defendant's license information into the computer to do a routine record check. Such a check would reveal whether Defendant had a valid driver's license, and if there were any warrants for his arrest, etc. While awaiting a response, Braden asked Defendant whose wedding he was attending.

Defendant hesitated before answering and then said "he was going to his brother's girlfriend's wedding." This response was so odd that Braden could not understand what it meant. When he asked who the girl was marrying, Defendant said the person was "some friend" that he didn't know. Defendant also disclosed that he was only staying in St. Louis a couple of days. At this point, Braden's suspicions were aroused. It seemed strange that Defendant would be driving such a long distance for such a short stay, particularly to attend the wedding of persons he did not appear to know very well. Furthermore, Braden had not seen any clothing in the car that would be appropriate to wear to such an event. Finally, from prior training and experience, he was aware that illegal contraband such as drugs often were transported from Tucson to St. Louis on I–44.[3] Coupled with Defendant's other unusual behavior and statements from the outset of the traffic stop, Braden began to suspect that criminal activity was afoot. He continued to converse with Defendant. When Braden asked Defendant if there was any clothing in the trunk, he did not respond at all. Braden then asked if there was anything illegal in the trunk. Again, Defendant said nothing. Braden asked for permission to search the Lincoln. Defendant said, "you can look around in my vehicle." Braden did not treat Defendant's response as consent because it was not clear that he understood Braden intended to search the trunk. When Braden specifically asked for consent to search the trunk area, Defendant said he did not have a key. That response was unusual because rental companies always issue their customers keys to the trunk, and one key operates both the ignition and the trunk on most vehicles manufactured in 1991.

---

**3.** Braden had been involved in 120–30 traffic stops in which he had seized a sufficient quantity of an illegal drug to constitute a felony.

Braden then received a response to the license check. It revealed that Defendant had a valid Arizona license and a prior drug conviction. Because Defendant had not consented to a search of the trunk, Braden decided to conduct a canine sniff of the Lincoln. Approximately ten minutes had elapsed since the traffic stop began. At that point, Braden had not yet issued any warnings to Defendant or completed the entries necessary to enter the warnings into the Highway Patrol computer system.[4] Braden started at the rear of the Lincoln, and Or gave several positive indications that there were drugs in the trunk. The car was equipped with an automatic trunk release lever. When Braden activated the lever and opened the trunk, he immediately smelled the strong odor of marijuana. There were five large duffel bags in the trunk. The bags were zipped shut, but he could see the outline of large, bulky objects inside. When he unzipped a bag, he observed a large, plastic-wrapped bundle. Braden punctured the plastic bundle with his knife and found marijuana inside. The five duffel bags contained approximately 178 pounds of marijuana.

Defendant was arrested for possession of a controlled substance. Prior to trial, defense counsel filed a motion to suppress the marijuana found during the search of the Lincoln. The motion alleged, *inter alia*, that the search was conducted without probable cause and, therefore, violated the rights granted to Defendant by the Fourth and Fourteenth Amendments of the United States Constitution and art. I, § 15 of the Missouri Constitution. After

hearing the evidence presented at the suppression hearing, the trial court denied the motion. Following Defendant's conviction, he appealed.

### III. Discussion and Decision

■■■ The Fourth Amendment to the United States Constitution guarantees citizens the right to be free from unreasonable searches and seizures. *State v. Barks*, 128 S.W.3d 513, 516 (Mo. banc 2004).[5] This guarantee is enforced through the exclusionary rule, which was first articulated in *Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914). *See State v. Jackson*, 186 S.W.3d 873, 879 (Mo.App.2006). In *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the protection of the exclusionary rule was extended, via the Fourteenth Amendment, to defendants in state prosecutions. *Id.* at 655, 81 S.Ct. 1684; *Jackson*, 186 S.W.3d at 879. To be reasonable, a search or seizure usually must be based on probable cause and executed pursuant to a warrant. *See State v. Dillard*, 158 S.W.3d 291, 297 (Mo.App. 2005); *State v. Gantt*, 87 S.W.3d 330, 332 (Mo.App.2002). Thus, "[w]arrantless searches or seizures are per se unreasonable unless there are special circumstances which excuse compliance with federal and state warrant requirements." *State v. Hensley*, 770 S.W.2d 730, 734 (Mo.App. 1989).

■■■ "A routine traffic stop based on the violation of state traffic laws is a justifiable seizure under the Fourth Amendment." *State v. Barks*, 128 S.W.3d

---

**4.** Because of the duties Braden was required to perform in connection with Defendant's drug arrest, the entry of the warnings into the computer system was not concluded until later in the day.

**5.** The protection provided to Missouri citizens by art. I, § 15 is coextensive with that provid-

ed by the Fourth Amendment of the United States Constitution. *State v. Rushing*, 935 S.W.2d 30, 34 (Mo. banc 1996); *State v. Richmond*, 133 S.W.3d 576, 579 (Mo.App.2004). Therefore, our discussion is confined to an analysis of Defendant's Fourth Amendment claim.

513, 516 (Mo. banc 2004). Such a seizure, however, "may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation." *State v. Granado*, 148 S.W.3d 309, 311 (Mo. banc 2004). "Once the investigation of a traffic stop is concluded, the detainee must be allowed to proceed unless specific, articulable facts create an objectively reasonable suspicion that the individual is involved in criminal activity." *State v. Dickerson*, 172 S.W.3d 818, 820 (Mo.App.2005).

■ On appeal, Defendant contends that the trial court clearly erred in denying the motion to suppress and in admitting evidence relating to the search at trial. Defendant argues that: (1) the period of Defendant's lawful seizure ended when Braden received the results of the computerized driver's license check and intended to issue a warning to Defendant; and (2) therefore, "Officer Braden's seizure of [Defendant] while searching his car with the drug dog after the initial stop had concluded was an unlawful violation of his Fourth Amendment rights." Defendant's argument rests on two implicit assertions: (1) the traffic stop had concluded before the canine sniff of the Lincoln occurred; and (2) without the additional information thereby provided, Braden lacked any specific, articulable facts to support an objectively reasonable suspicion that Defendant was involved in criminal activity. Based on our review of the complete record, neither assertion is correct.

■ The first prong of Defendant's argument fails because Braden had not issued any warnings to Defendant before the canine sniff took place. Therefore, the investigatory phase of the traffic stop was still ongoing. *See State v. Watkins*, 73 S.W.3d 881, 883–84 (Mo.App.2002). As this Court explained in *State v. Jones*, 204 S.W.3d 287 (Mo.App.2006):

> A reasonable investigation of a stop for a traffic violation may include the following steps: (1) asking for the driver's license, registration and proof of insurance; (2) requesting that the driver sit in the patrol car; (3) questioning the driver about his purpose and destination; (4) running a computer check on the driver and his vehicle; and (5) issuing a warning or citation. "As long as the officer is investigating these items, running the records check, and issuing a citation, the officer may continue to conduct a reasonable investigation of the traffic violation by conversing with the driver." Thus, a routine traffic stop is not concluded until the warning or citation is issued.

*Id.* at 292 (citations omitted). When Braden decided to conduct the canine sniff, the traffic stop had only lasted about ten minutes. He had just received a response to his records check, and Defendant was still sitting in the patrol car. There is no indication in the record that his driver's license or the rental agreement had been returned to him. Indeed, he had not even been told that he was going to receive warnings for his traffic violations. Finally, it is undisputed that Braden had not completed the entry of the necessary information to record the warnings in the Highway Patrol's computer system.[6] Defendant's assertion that the traffic stop ended before Braden actually issued any warnings is contrary to a host of prior Missouri decisions. *See, e.g., State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007) (the traffic stop was complete when the

---

**6.** The warnings were recorded electronically in Jefferson City, and no paper copies were generated. In order to create this electronic record, Braden first had to input the neces-

sary data. That task was delayed until after Braden had completed his duties relating to Defendant's drug arrest.

officer handed the defendant a warning ticket, returned her license and told her to be careful); *State v. Granado*, 148 S.W.3d 309, 311 (Mo. banc 2004) (the traffic stop was complete when the patrolman gave defendant a written warning, told him he was free to go and he stepped out of the patrol car); *State v. Bones*, 230 S.W.3d 364, 367–68 (Mo.App.2007) (even though the officer had already determined to give defendant a ticket, the traffic stop was not over until the ticket was issued); *Jones*, 204 S.W.3d at 292–93 (the traffic stop was not over because the officer had not yet finished filling out the ticket); *State v. Sanchez*, 178 S.W.3d 549, 555 (Mo.App. 2005) (the traffic stop ended when the officer issued the warning and told defendant that she was free to go); *State v. Dickerson*, 172 S.W.3d 818, 820–21 (Mo. App.2005) (the traffic stop concluded when the officer issued a warning, returned the defendant's license and told her to drive safely); *State v. Shoults*, 159 S.W.3d 441, 446 (Mo.App.2005) (the traffic stop was completed when the officer gave the warning and returned the defendant's license); *State v. Stevens*, 845 S.W.2d 124, 128 (Mo. App.1993) (the traffic stop concluded when the officer completed his records check, returned the defendant's license, gave him a warning and told him to go back to his vehicle). The first prong of Defendant's argument lacks merit.

▬▬ The second prong of Defendant's argument fares no better. Information acquired by an officer during a lawful seizure to investigate a traffic violation can authorize continued detention if the officer has "an objectively reasonable suspicion that the driver or passengers were involved in criminal activity based on specif-ic, articulable facts." *Shoults*, 159 S.W.3d at 446; *State v. Jackson*, 186 S.W.3d 873, 880 (Mo.App.2006). In determining whether such an objectively reasonable suspicion existed, a trial court must consider the totality of the circumstances in light of the facts confronting the officer at the time. *State v. Stevens*, 845 S.W.2d 124, 129 (Mo.App.1993). Factors consistent with innocent conduct when considered alone may, when taken together, amount to reasonable suspicion. *State v. Day*, 87 S.W.3d 51, 55 (Mo.App.2002).[7] The pertinent inquiry is not whether particular conduct demonstrates guilt or innocence, but rather the degree of suspicion that attaches to particular noncriminal acts. *Id.* For example, excessive nervousness by itself cannot create reasonable suspicion, but that factor can be considered, along with others, in determining whether the totality of the circumstances supported the existence of reasonable suspicion. *State v. Weddle*, 18 S.W.3d 389, 394 (Mo.App.2000).

At the time Braden received the results of the records check, he had become aware of the following facts: (1) Defendant's unusual behavior in initially failing to stop for Braden; (2) Defendant's immediate exit from his own vehicle when he did stop; (3) Defendant's excessive nervousness throughout his encounter with Braden; (4) Defendant's untenable explanation for why it took him so long to stop; (5) the fact that Defendant was traveling from a known drug source area to a known drug destination area in a rental car over a very short time frame; (6) Defendant's hesitant and unlikely explanation of the purpose for his trip; (7) the absence of any appropriate clothing in Defendant's

---

**7.** As this Court noted in *State v. Gonzalez*, 235 S.W.3d 20, 31 n. 9, (Mo.App. 2007), an officer can be aware of sufficient facts to support the existence of reasonable suspicion, even though the same facts would not rise to the level of probable cause to conduct a search or be sufficient to meet the State's burden of proving guilt beyond a reasonable doubt.

vehicle for such a trip; (8) Defendant's failure to respond when specifically asked if there was any clothing or illegal items in the trunk; (9) Defendant's unusual statement that he had no key for the trunk of his rented automobile; and (10) Defendant's prior drug conviction. Considered collectively, these specific, articulable facts support an objectively reasonable suspicion that Defendant was involved in criminal activity so as to justify his continued detention. *See, e.g., State v. Bizovi*, 129 S.W.3d 429, 432–33 (Mo.App.2004) (reasonable suspicion existed because defendant was nervous, was not driving his own vehicle, did not seem to have adequate clothing for a winter trip to Michigan and was traveling on I–44 from a known drug origination city to a known drug destination city); *Day*, 87 S.W.3d at 55 (reasonable suspicion existed because defendant was visibly nervous and shaking, was driving a rental car eastbound on I–44 from a known drug area to a known drug destination, and had fast food wrappers in the car indicating that she was making a fast trip); *State v. Joyce*, 885 S.W.2d 751, 754 (Mo. App.1994) (reasonable suspicion existed because of the known use of I–44 in transporting contraband from southwest to northeast, the use of a rented automobile for a long journey, the unlikely story about a ski trip to a remote area when other ski areas were much closer, the occupants' nervousness, and their inconsistent stories). In addition, Braden was entitled to consider the results of the canine sniff because it occurred prior to the end of Defendant's traffic stop. Considering the totality of the circumstances, Braden was aware of specific, articulable facts supporting an objectively reasonable suspicion that Defendant was involved in criminal activity. His continued detention to investigate that reasonable suspicion did not violate the Fourth Amendment. The sec-ond prong of Defendant's argument has no merit. Point denied.

In conclusion, the trial court did not clearly err in denying Defendant's motion to suppress or in admitting evidence that Braden seized 178 pounds of marijuana from the trunk of Defendant's car because there was substantial evidentiary support for the trial court's decision. The judgment is affirmed.

PARRISH, P.J., and SCOTT, J., Concur.