GOLDEN FOODS, INC.; Golden Brands, Inc.; William A. Becker; and Karen K. Becker, Appellants

v.

The LOUISVILLE & JEFFERSON COUNTY METROPOLITAN SEWER DISTRICT, Appellee.

No. 2006–CA–001645–MR.

Court of Appeals of Kentucky.

Nov. 21, 2007.

See also 2003 WL 1253699

Paul J. Hershberg, Glenn A. Cohen, Alan N. Linker, Louisville, KY, for Appellants.

John H. Dwyer, Jr., Louisville, KY, for Appellee.

Before NICKELL, STUMBO, and THOMPSON, Judges.

## OPINION

THOMPSON, Judge.

Golden Foods, Inc., Golden Brands, Inc., William A. Becker, and Karen K. Becker (collectively "Golden Foods") appeal from an opinion and order of the Jefferson Circuit Court entered on July 11, 2006, denying its motion for attorney fees. Having concluded that the trial court did not abuse its discretion, we affirm.

The relevant facts of this case were stated by this Court in an unpublished opinion, No.2001–CA–001457–MR, which affirmed the trial court's finding that the Metropolitan Sewer District (MSD) failed to negotiate in good faith for the acquisition of Golden Foods' property prior to the initiation of condemnation proceedings. We adopt the facts as stated in No.2001–CA–001457–MR, as follows:

In the mid–1990's residents of Harold Avenue, an unincorporated area of Jefferson County, experienced increasing storm water drainage problems. Several Harold Avenue residents contacted MSD about the need for storm water drainage improvements in the area. According to Mr. Loyiso Melisizwe, MSD's Beargrass Creek Area team leader, a couple of the residents expressed an interest in also obtaining sewer service but the primary concern was storm water drainage. Because construction of storm water drainage improvements would entail extensive construction work in the area, MSD deemed it desirable to explore with the neighborhood residents the possibility of simultaneously constructing a sewer system.

On April 17, 1997, MSD held a public meeting for the Harold Avenue residents. At that meeting the residents were informed that a sewer project was being considered but that to receive sewers the majority (51%) of the voting property owners must vote in favor of it. Residents were informed that the drainage improvements along Harold Avenue would be constructed regardless of the neighborhood vote on the sewer project. Residents were given until May 2, 1997, to return their ballots. Of the 112 property owners in the Harold Avenue neighborhood only 68 voted; 34 voted in favor of the sewer project and 34 voted against it. This tie vote was the third time Harold Avenue residents had been asked to consider a sewer project. The residents had rejected a sewer system on two prior occasions beginning sometime in the mid–1980's.

On May 9, 1997, MSD Executive Director Gordon R. Garner recommended to the MSD Board that it proceed with the Harold Avenue project, noting that "of the 68 responses, 50% were in favor of the installation of sanitary sewers in the area." Although the written recommendation in May 1997 accurately reflects that a majority of the residents did not approve sewers, when Mr. Gar-

ner was deposed in this condemnation proceeding, he indicated repeatedly that the Harold Avenue project was undertaken because the majority of the residents had voted for a sewer system. Mr. Melisizwe testified that MSD generally does not build a sewer project unless (1) the Board of Health requires or a court orders construction due to health and environmental concerns; (2) MSD receives a request from a small city or other incorporated area; or (3) the majority of the residents in an affected area vote in favor of the project. Although Mr. Melisizwe said that typically this last option entails at least a 51% vote, he alluded to without elaboration, "a couple" of prior occasions where projects were undertaken without a majority vote. Carolyn Williams, MSD Project Manager for the Harold Avenue project, testified in conformity with her prior representations to Harold Avenue residents that for a project to proceed a majority of the voting residents must vote affirmatively.

Even though a majority of the Harold Avenue residents did not vote affirmatively, the MSD Board approved the project and moved forward. Although several options were considered for providing sanitary sewers to Harold Avenue residents, MSD ultimately focused on two alternatives. The so-called gravity alignment would connect to an existing 45–inch private sewer line which runs across the entire length of the Golden Foods property and a small portion of the Golden Brands and Becker properties and then connects to MSD's existing system. The McCloskey Avenue pump station option involved building a pump station and pumping the Harold Avenue wastewater to a McCloskey Avenue sewer line owned by MSD.

\*     \*     \*     \*     \*     \*

In June or July of 1997, MSD first contacted Golden Foods to discuss the possible acquisition of the private sewer line. At that time MSD proposed that Golden Foods relinquish ownership of the existing sewer line in exchange for MSD's installation of a new separate, parallel 8–inch sewer line to be constructed for the apparent exclusive use of Golden Foods. Under this proposal, the Harold Avenue residents and presumably Parallel Products (an upstream neighbor who was using the Golden Foods sewage line by virtue of ... [an] easement agreement) would be serviced by the existing sewer line. Because of the nature of Golden Foods and Golden Brands business, food processing, the companies expressed concern that MSD's excavation and construction would interfere with their ability to service their clients who require timely deliveries. Golden Foods was particularly concerned because the proposed new sewer line and the existing sewer line would both run "right through the center of its (Golden Foods') property where numerous utility lines and other connections exist, and where customers, suppliers, vendors and employees maintain their main ingress and egress for the conduct of Golden Food's business." Other concerns voiced by Golden Foods representatives included potential environmental problems with respect to any removed soil and the location of any sampling points for monitoring Golden Foods effluent and discharge.

For six and one-half months after this initial overture, the parties had no contact but they resumed discussions in January 1997, again discussing MSD assuming ownership of the existing 45–inch line and constructing a new 8–inch line for Golden Foods' use. The estimated cost of construction of the new smaller sewer line was approximately

$56,000–$60,000.00. Eventually attorneys for MSD and Golden Foods became involved in exchanging several draft agreements, a process which continued through the spring and summer of 1998 and into early 1999. On February 25, 1999, Camille Irwin, attorney for MSD, wrote Alan Linker, counsel for Golden Foods, to advise that MSD was withdrawing all prior offers and terminating negotiations. She identified substantial areas of disagreement which were paragraphs 7(G), 7(H) and 10 of Golden Foods' proposed agreement of February 17, 1999. Paragraph 7(G) dealt with MSD's abatement of testing of Golden Foods effluent until the new parallel sewer line was completed. Paragraph 7(H) required MSD to perform soil sampling of the easement area and if environmental contaminants were present, to either dispose of the soil or replace the soil in its original location rendering the parties' agreement null and void. Paragraph 10 contained a provision for MSD obtaining adequate insurance coverage to indemnify Golden Foods against any losses or damages for business interruption caused by MSD's construction or maintenance work on Golden Foods' property.

Documents in MSD's files reflect that after negotiations with Golden Foods were halted, MSD's engineers deemed the gravity alignment a "not workable option" and pursued the McCloskey Avenue pump station option. [Eventually, however, MSD revived the gravity alignment option and sought to condemn the appellees' property.]

After Ms. Irwin's February 1999 letter, MSD did not contact Golden Foods until over fourteen months later when another MSD attorney, Julia Lundy, sent a May 19, 2000, letter offering Golden Foods $180.00 for its private sewer line. This figure was later determined to be a typographical error and MSD's "last and final good faith offer" for the 45–inch sewer line was $4,000. Presented with the potential for a condemnation proceeding in May–June 2000, Mr. Linker contacted Ms. Irwin and offered to give MSD a sewer easement entering Golden Foods' property on the west and proceeding at MSD's election either north or south and then east. Golden Foods made this proposal to reduce the risk of business interruption or interference since the construction would take place on the perimeter of its property as opposed to through the center. MSD rejected this offer and further noted that it had withdrawn its prior offer back in February 1999 because of a "substantial change" by Golden Foods which was "determinative in MSD's decision to withdraw [its] offer." The offending paragraph, 4(11), simply stated "this easement is granted subject to any prior easements on record." In her June 26, 2000, letter Ms. Irwin, counsel for MSD, indicated that "at that point MSD, who had been dealing in good faith, withdrew its offer." These condemnation proceedings were commenced on July 11, 2000. That same date Mr. Linker on behalf of Golden Foods informed Ms. Irwin that the "substantial change which was determinative in MSD's decision to withdraw their offer" was actually language that MSD had included in the agreement.

Following the filing of this action, commissioners were appointed and their initial report was received on July 31, 2000. An Amended Petition of Condemnation was filed on October 24, 2000. On November 22, 2000, [Golden Foods] filed an answer to the Amended Petition for Condemnation challenging the right of MSD to condemn their private sewer line. Discovery was conducted by both

parties and a one-day right to take hearing was conducted by this Court pursuant to KRS 416.610 on May 2, 2001. The Court heard testimony from Loyiso Melisizwe and Carolyn Williams of MSD and Alan Linker on behalf of [Golden Foods]. In addition, the Court considered deposition testimony of Gordon Garner, Executive Director of MSD, and Camille Irwin, counsel for MSD.

After the hearing, the trial court dismissed MSD's petition for condemnation. The court ruled that MSD's conduct during negotiations did not meet the good faith standard required of condemnors. Specifically, the trial court wrote that MSD had failed to accommodate the reasonable requests of Golden Foods and had impermissibly taken the position that it did not have to negotiate due to its condemnation authority by dramatically reducing the amount it would spend for the property from approximately $60,000 to $4,000. Following this dismissal, MSD appealed.

During the pendency of the appeal of the dismissal, MSD and Golden Foods began a second round of negotiations regarding the acquisition of the disputed property. After these negotiations proved unsuccessful, on June 11, 2002, MSD filed a second petition to condemn the disputed portion of Golden Foods' property. After a right-to-take hearing, the trial court granted MSD's condemnation petition after finding that it had proceeded in good faith in attempting to acquire the disputed property. Golden Foods appealed and this Court affirmed the trial court's ruling in an unpublished opinion, No.2004–CA–000688–MR.

As the second condemnation action was proceeding, Golden Foods filed a motion for an award of attorney fees relating to its successful defense of MSD's first petition to condemn its property. Golden Foods contended that *Bernard v. Russell*

*County Air Board,* 747 S.W.2d 610 (Ky. App.1987), and *Northern Kentucky Port Authority, Inc. v. Cornett,* 700 S.W.2d 392 (Ky.1985), supported its claim for attorney fees. In its order denying Golden Foods' motion, the trial court ruled that while MSD's initial negotiation efforts were not sufficient to meet good faith standards so as to allow for the taking, they were not so egregious to justify the extraordinary award of attorney fees. This appeal follows.

Golden Foods' sole assignment of error is that the trial court failed to award it attorney fees after MSD was adjudged to have acted in bad faith. We disagree.

First, we observe that attorney fees are generally not recoverable without a specific contractual provision or a fee-shifting statute. *AIK Selective Self–Insurance Fund v. Minton,* 192 S.W.3d 415, 420 (Ky.2006). However, there is an exception to this general rule which permits an award of attorney fees in condemnation proceedings under certain circumstances. *Com., Dept. of Transp., Bureau of Highways v. Knieriem,* 707 S.W.2d 340, 341 (Ky.1986).

Under this exception, after the successful defense of a condemnation proceeding, a trial court may award attorney fees if the court determines that the condemnor has acted in bad faith or caused unreasonable delay. *Id.* If a trial court finds such improper conduct, it should determine the extent that the condemnee has been prejudiced and whether he can be made reasonably whole by the imposition of costs and fees. *Northern Kentucky Port Authority, Inc. v. Cornett,* 700 S.W.2d at 394. However, an award of attorney fees is within the sound discretion of the trial court, and its decision will not be disturbed absent a finding of abuse of discretion. *Ford v. Beasley,* 148 S.W.3d 808,

813 (Ky.App.2004). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

After applying the applicable law, we conclude that the trial court did not abuse its broad discretion in denying Golden Foods' motion for attorney fees. We disagree with Golden Foods that a finding of bad faith requires a court to award attorney fees as a matter of law. In condemnation proceedings, trial courts are granted broad discretion in awarding attorney fees based on their analysis of the unique facts of each case and that discretion will not be disturbed unless equity demands that we do so. *Bernard v. Russell County Air Board,* 747 S.W.2d at 612.

Although the trial court found that MSD had exercised legitimate authority in attempting to take land for public use, it recognized that MSD had failed to bargain in good faith during pre-condemnation negotiations. However, noting the condemnors' extremely deliberate bad faith conduct in *Bernard* and *Cornett,* the trial court ruled that MSD's conduct was not so prejudicial to justify the extraordinary award of attorney fees.

The trial court ruled that MSD's improper conduct, which consisted of its suddenly inadequate last offer of $4,000 when it had previously offered $60,000, did not warrant an award of attorney fees to Golden Foods. Because the trial court's ruling was based on a proper application of the law and within its broad discretion, the trial court did not err.

For the foregoing reasons, the opinion and order of the Jefferson Circuit Court is affirmed.

ALL CONCUR.