RENDERED: MARCH 18, 2010
TO BE PUBLISHED

## Supreme Court of Kentucky

2005-SC-001023-DG
2007-SC-000273-DG

SPRINT COMMUNICATIONS COMPANY, L.P.     APPELLANT/CROSS-APPELLEE

V.

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2004-CA-001739-MR
JEFFERSON CIRCUIT COURT NO. 01-CI-008663

ALBERT E. LEGGETT, III (AS TRUSTEE OF     APPELLEE/CROSS-APPELLANT
THE ALBERT E. LEGGETT FAMILY TRUST)

**OPINION OF THE COURT BY JUSTICE VENTERS**

**AFFIRMING IN PART AND REVERSING IN PART**

We granted discretionary review in this matter to consider issues relating to a landowner's abuse of process claim and other related claims, against a long-distance telephone communications carrier for its conduct in attempting to use the power of eminent domain to acquire the landowner's property. Specifically, we consider whether the tort of abuse of process may be established solely on the basis of actions that occurred at or before the commencement of the legal process.

### I.  RELEVANT FACTS AND PROCEDURAL HISTORY

Appellant, Sprint Communications Company, L.P. is a "telephone company" within the meaning of KRS 278.540(2) and KRS 415.150, and therefore, has a limited power to condemn a right of way across private property. Sprint filed a condemnation action in the Jefferson Circuit Court by

which it sought to acquire a "permanent utility easement" over an entire half-acre lot owned by the Albert E. Leggett Family Trust, Albert E. Leggett III, Trustee. Leggett challenged Sprint's right to take the property and filed a counterclaim against Sprint for abuse of process, malicious prosecution, and violation of Leggett's civil rights under 42 USC § 1983.

Because the trial court dismissed Leggett's claims on summary judgment, no trial verdict or findings of fact exist to resolve disputed facts. Our attention is therefore focused on whether the evidence produced in the record established a genuine issue of material fact. We base the following recitation of facts on the pleadings and evidence produced in the process of discovery, mindful that in assessing the propriety of summary judgment, we construe disputed questions of fact in the light most favorable to the opponent of summary judgment, which here is Leggett. *Steelvest v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky. 1991).

Sprint is a long-distance telephone communications carrier with fiber optic and traditional line-based operating facilities located in Louisville. In the spring of 2001, Sprint concluded that its "point of presence" (POP) facility located at 340 Baxter Avenue in Louisville would soon become inadequate, and that an expanded and upgraded facility was needed. The POP facility is a securely fenced, large air-conditioned building that houses the computers, generators, and other equipment used to convert local telephone signals to Sprint's long-distance service. Sprint determined that the ideal site for a new

POP facility was the adjoining property owned by Leggett, located at 330-336 Baxter Avenue.

The Leggett property is a 22,172 square-foot (one half-acre) five-sided lot upon which is located a 9,700 square-foot building that houses Leggett's photography studio. The Leggetts purchased the land in 1990 for $325,000. Sprint's proposed use of the Leggett tract would require demolition of the building and the construction of its own new building.

Before approaching Leggett, Sprint researched the property values in the area around the property. In the summer of 2001, through an agent by the name of Steven Gilley, Sprint contacted Leggett and asked him to set a price at which he would sell the property at 330-336 Baxter Avenue. Leggett said he would sell for $900,000. On Sprint's behalf, Gilley offered Leggett $200,000 for the tract. This offer was supported by a written appraisal prepared for Sprint by a local appraiser. Gilley informed Leggett that if he declined that offer, Sprint would take the land it needed by condemnation, expressly warning Leggett of the "time and legal cost associated with condemnation." Faced with the threat of condemnation, Leggett employed an attorney, who in August 2001, wrote to Gilley to inquire by what authority Sprint would condemn Leggett's entire property. Gilley declined to respond to that inquiry. Shortly afterwards, Gilley contacted municipal development authorities with the city of Louisville, seeking the city's assistance in obtaining the Leggett tract by condemnation, and suggesting that Louisville could condemn the land and

make it available to Sprint through an urban renewal project. The city declined.

On October 10, 2001, an attorney for Sprint contacted Leggett's counsel with a new offer to purchase the land for $250,000. That offer was accompanied by another reminder that only a voluntary sale to Sprint would "avoid the rigors of contest and associated unpleasantries." Leggett then obtained his own professional appraisal, which valued the property at $750,000. Sprint increased its offer to $275,000, which Leggett declined.

On December 19, 2001, Sprint filed the condemnation action to take the Leggett property, alleging in its complaint that it "possess[ed] the power to acquire real property through the exercise of eminent domain exercised pursuant to KRS 416.150 and KRS 278.540." Sprint also pled that it had "the authority to acquire . . . by condemnation such property or interest therein as [it] may determine to be necessary, proper and convenient for its corporate purposes." The complaint included the legal description of Leggett's entire property at 330-336 Baxter Avenue, and claimed that Sprint "need[ed] to acquire the property for a permanent utility easement . . . for the purpose of constructing the project . . . [.]" The court-appointed commissioners found the fair-market value of Leggett's property immediately before the proposed taking was $600,000, and that the value of the property remaining to Leggett after the taking was $0. Leggett filed a counterclaim for abuse of process, malicious prosecution, and violation of his civil rights under 42 USC § 1983.

In March 2002, Sprint moved to voluntarily dismiss its condemnation action, and eventually the petition for condemnation was dismissed. The case proceeded through the discovery process on Leggett's counterclaim until Sprint moved for summary judgment. The trial court granted the summary judgment in favor of Sprint. The trial court dismissed Leggett's malicious prosecution claim because the original proceedings had not yet finally terminated, and because Leggett had not established that Sprint lacked probable cause to commence the condemnation action. The trial court dismissed the abuse of process claim because it concluded that Sprint could have no "ulterior purpose" in seeking to condemn the property, and Sprint "had done nothing more than what it was authorized to do in this judicial process." The trial court then noted that Leggett had no evidence to show that Sprint acted improperly or deprived him of due process, and thus dismissed the civil rights claim.

The Court of Appeals affirmed the summary judgment with respect to the malicious prosecution claim, but reversed with respect to the abuse of process and civil rights claims, and remanded those claims for further proceedings in the circuit court. The Court of Appeals also considered, and affirmed, the order of the trial court substantially limiting Leggett's discovery of certain sealed documents on the grounds that they were protected by attorney-client privilege.

We granted Sprint's petition for discretionary review to consider its claim that the Court of Appeals misapplied the law pertaining to the tort of abuse of

5

process and the civil rights claim in the context of the condemnation action. Leggett cross appealed the Court of Appeals ruling on discovery, but did not cross appeal the dismissal of the malicious prosecution claim.

For reason set forth below, we affirm the Court of Appeals' decision to reverse the summary judgment granted against Leggett's abuse of process and civil rights claims. However, we reverse the Court of Appeals ruling which affirmed the limitation of Leggett's discovery.

## II. ABUSE OF PROCESS

Sprint first argues that the Court of Appeals misapplied the elements of the tort of abuse of process and concluded erroneously that genuine issues of material fact existed which compelled reversal of the summary judgment. Because appellate review of decisions to grant or deny summary judgment involves only questions of law, we conduct a *de novo* review of the matter, without deference to decisions of the courts below. *Bob Hook Chevrolet Isuzu, Inc. v. Com. Transp. Cabinet,* 983 S.W.2d 488, 490 (Ky. 1998); *Lewis v. B & R Corporation,* 56 S.W.3d 432, 436 (Ky. App. 2001).

We begin with an overview of the tort of abuse of process and a review of representative Kentucky decisions dealing with it.[1]

Generally stated, one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which that process is not designed, is subject to liability to the other for harm caused by the abuse of

---

[1] We do not purport to recite here every Kentucky decision addressing abuse of process, but we believe this selection accurately reflects the modern development of the tort in Kentucky.

process. Restatement (Second) of Torts § 682 (1977). There is no liability where the defendant (usually a plaintiff in the underlying action) has done nothing more than carry out the process to its authorized conclusion. W. Prosser, *Handbook of the Law of Torts*, § 121 (4th ed. 1971).

In *Stoll Oil Refining v. Pierce*, 337 S.W.2d 263, 266 (Ky. 1960) our predecessor Court defined abuse of process simply as "the irregular or wrongful employment of a judicial proceeding." Liability in *Stoll* was predicated and upheld solely upon the improper issuance of a forcible detainer without the required bond to dispossess a tenant from the leasehold. *Id.*

In *Flynn v. Songer*, 399 S.W.2d 491 (Ky. 1966), Judge Palmore explained the tort of abuse of process. Flynn, as the credit manager of a business to which Songer was indebted, obtained a garnishment of Songer's wages. Songer, desiring relief from the garnishment, swore out an arrest warrant charging Flynn with practicing law without a license.[2] After the issuance of the warrant and before the arrest, Songer informed Flynn of the warrant and said that he wanted an agreement "to do away with this thing without any trouble." *Id.* at 493. Quoting Prosser, the Court stated:

> [T]he gist of the tort[abuse of process] is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance . . . . The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the

---

[2] The basis of the criminal charge was the fact that Flynn was not a lawyer and had represented his corporate employer before a judicial officer to obtain the garnishment.

proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

*Id.* at 494 (internal citations omitted). The Court emphasized, "It makes no difference whether [Songer] did or did not intend to withdraw the criminal charge, provisionally or otherwise. The gist of the tort is that they attempted to use it as a means to secure a collateral advantage." *Id.* at 495.

In *Williams v. Central Concrete, Inc.,* 599 S.W.2d 460 (Ky. App. 1980), abuse of process applied to an action brought to enforce a materialmen's lien imposed upon real property beyond that which was properly subject to the lien. The Court stated, "The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a willful act in the use of the proceeding not proper in the regular course of the proceeding." *Id.* at 461 (citing W. Prosser, *Handbook of the Law of Torts*, § 121 (4th ed. 1971)). *Central Concrete* holds, "Among the acts condemned by the law as subject to action for abuse of process are seizure of property not subject to the debt, overstatement of claims, or seizure of excessive property." *Id.*

Later, *Mullins v. Richards,* 705 S.W.2d 951 (Ky. App. 1986), held that obtaining an indictment alone, even with an ulterior purpose, is not abuse of process. There must be some act or use of the process to secure a collateral advantage outside the criminal proceeding.

We addressed the issue most recently in *Simpson v. Laytart,* 962 S.W.2d

8

392 (Ky. 1998), reiterating that an action for abuse of process is "the irregular or wrongful employment of a judicial proceeding[,]" and has two essential elements: 1) an ulterior purpose, and 2) a willful act in the use of the process not proper in the regular conduct of the proceeding. *Id.* at 394. We emphasized, again citing W. Prosser, *Handbook of the Law of Torts,* § 121 (4th ed. 1971), that some definite act or threat not authorized by the process, or aimed at an objective which is not a legitimate use of the process was required. The act or threat usually manifested by some "form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property on the payment of money" using the process as a threat or a club. *Simpson,* 962 S.W.2d at 395. The process is used as a form of extortion, and "it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." *Id.* (citing W. Prosser, *Handbook of the Law of Torts,* § 121 (4th ed. 1971)). Notably, our analysis in *Simpson* incorporates the concept that "there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even though with bad intentions." *Id.* at 394-395.

A. Leggett's Evidence Establishing the Elements of Abuse of Process

Returning to the instant case, Sprint's specific argument is that the trial court properly granted summary judgment dismissing Leggett's abuse of process claim because Leggett failed to present evidence to establish either of the two "essential elements" of abuse of process. We examine the evidence

with respect to each.

## 1. Evidence of Sprint's "Ulterior Purpose"

Leggett claims that he satisfied the "ulterior purpose" element of the tort by producing evidence that Sprint intended to use the burden and expense of the condemnation action to pressure Leggett into selling an interest in his land beyond what Sprint could legally obtain by a valid condemnation action. Sprint contends that Leggett can not prove the existence of an "ulterior purpose" because it had "an undisputed right" to "file the petition for condemnation in order to condemn the property and to complete the necessary expansion[3] of its services." In other words, Sprint claims it sought to obtain nothing other than what was proper in the condemnation litigation. However, we agree with the Court of Appeals and with Leggett.

A telephone company does not have the right under Kentucky law to take by the power of eminent domain a "permanent easement," coextensive with an entire tract of land, demolish the principal buildings located thereon, and totally deprive the owner of any use thereof. KRS 278.540(2), which empowers Sprint and other telephone companies to take private property by condemnation, provides in pertinent part:

> Any telephone company authorized to do business in this state
> may, by contract with any person, construct, maintain and operate
> telephone lines on and across the real property of that person, and
> if it cannot obtain the right of way by contract it may . . . condemn

---

[3] Whether the expansion of service was necessary is not at issue here, but apparently the acquisition of Leggett's property was not necessary as Sprint moved to voluntarily dismiss the condemnation in March 2002, less than 90 days after filing its petition.

10

the right of way in the manner provided in the Eminent Domain
Act of Kentucky.

Because of the strong constitutional underpinning of personal property rights in Kentucky,[4] we strictly construe statutes which empower the government to take a citizen's property, or which delegate such power to corporations engaged in work for the benefit of the public. *See Bell's Committee v. Board of Education of Harrodsburg*, 192 Ky. 700, 234 S.W. 311, 312 (1921)(holding that "[t]he delegation of the power (to take property by condemnation) is usually exercised by the Legislature through a statutory enactment, and such statutes are to be strictly construed, since the power will not be conferred by implication.").

We agree with the Court of Appeals that even a cursory reading of the statute reveals that Sprint had no authority to take for its permanent use the entirety of Leggett's land. There is no ambiguity in the language of KRS 278.540(2). When a telephone company is unable to purchase a "right of way" for its "telephone lines on and across the real property" of another person, it may "condemn the right of way." A "right of way" is defined as "[t]he right to pass through property owned by another." *Black's Law Dictionary*, 8th Edition 1351 (2004); 25 Am Jur. 2d. 502, *Easements and Licenses*, § 5. Sprint's apparent need for Leggett's property cannot reasonably be construed as simply

---

[4] Section 1 of the Kentucky Constitution enumerates "the right of acquiring and protecting property" as one of the "certain inherent and inalienable rights." Section 13 of the Kentucky Constitution prohibits the taking of one's property for public use "without the consent of his representatives, and without just compensation being previously made to him." Section 242 requires "[C]orporations, and individuals invested with the privilege of taking private property for public use, shall make just compensation . . . ."

11

the need to "pass through the property of another." Far from intending to "pass through" Leggett's land, Sprint's intention was to permanently acquire the use of Leggett's entire tract, so that it could tear down Leggett's building and erect a new POP facility. Such a taking has all of the significant qualities of fee-simple ownership, leaving Leggett's residual interest in the property worth nothing and of no use. We cannot construe the term "right of way" so broadly as to allow Sprint to consume Leggett's entire half-acre lot in perpetuity. The right to pass through another's land cannot be equated with the power to divest that person of all meaningful attributes of his ownership interest.

Sprint also argues that the words "telephone lines" in KRS 278.540(2) should be construed to include the POP facility it wanted to erect on Leggett's land. Sprint notes that vast technological changes have occurred since 1904, when the phrase "telephone lines" first entered our statutes, and since 1976, when KRS 278.540 was enacted. Certainly, wireless telephone capability, satellite communications, and fiber optic technology may have changed the way telephone companies operate and the way people use telephones. But, given our obligation to strictly construe a private corporation's condemnation power, we do not see those changes as grounds to expand the concept of "telephone lines" to include a large building. The fact that telephone signals enter and exit the proposed building by way of copper wires, fiber optic cables, or electromagnetic waves, does not make the building a "telephone line."

Moreover, Sprint's description of the building suggests that it functions much like a switchboard facility, directing the traffic of many "telephone lines" rather than as a "telephone line" itself. Telephone systems have always needed switchboard facilities and office buildings, yet the General Assembly has not granted them the power of eminent domain to acquire sites for such purposes.

A brief survey of the applicable statutes discloses that the power of eminent domain granted to telephone companies is much more limited than the power enjoyed by other private entities serving a public need. For example, a railroad company may take by condemnation "any land or material necessary for its use" to construct a railroad, KRS 416.010, and "such lands in the vicinity of or adjacent to its road as are necessary for cuts or embankments, the procurement of stone, gravel, or other material or for draining the roadbed." KRS 277.060. A water company may condemn the "lands and material necessary to [construct, maintain, or operate] waterworks or pipelines for the supply of water to a municipality." KRS 96.080. Companies that construct, maintain, or operate oil or gas pipelines may condemn "the lands and material or the use and occupation of the lands that are necessary for constructing, maintaining, drilling, utilizing, and operating pipelines, underground oil or gas storage fields, and wells." KRS 278.502. Producers of electricity for the purpose of light, heat, or power may condemn the "property, property rights, privileges or easements" needed "for its proposed dams, reservoirs, ponds, locks, bridges, power stations, roads, conduits and transmission lines, as well

13

as the land that may be overflowed by the erection of any dam or other structure." KRS 416.130.

We are satisfied that the very limited power described in KRS 278.540(2) is a plain, unambiguous expression of the General Assembly's intent to grant very limited condemnation authority to telephone companies. One cannot reasonably read into KRS 278.540(2) the authority to acquire by condemnation a "permanent easement" over an entire half-acre tract, upon which to construct a large building, in a way that totally deprives the owner of the use of his land.

Thus, the proper purpose of a telephone company's condemnation action is to acquire a right of way for telephone lines. Leggett produced sufficient evidence that Sprint's purpose in filing the lawsuit was to acquire the full, permanent control and use of all of Leggett's land to a degree indistinguishable from fee simple title. That is plainly a purpose for which a condemnation action under KRS 278.540 is not authorized, and therefore constitutes an "ulterior purpose," satisfying that element of the tort of abuse of process.

2. Sprint's Willful Act in the Use of the Process

The second element of the tort of abuse of process is "a willful act in the use of the process not proper in the regular conduct of the proceeding," used as a "form of coercion to obtain a collateral advantage." *Simpson,* 962 S.W.2d at 395. Leggett asserts that the willful act, used as coercion, was Sprint's threat of litigation to acquire the property that occurred before Sprint's suit was filed. Sprint argues that summary judgment was proper because abuse of process

14

can be established only if the coercion to obtain a collateral advantage occurs *after* the process (here, the condemnation suit) has been initiated. Leggett argues to the contrary, asserting that the coercion may occur before the process commences, and that in some circumstances, the initiation of the process may itself constitute the tortious act. This issue has not been squarely addressed in prior Kentucky decisions.

Sprint directs our attention to *Mullins v. Richards,* 705 S.W.2d 951 (Ky. App. 1986), where disgruntled customers of an automobile repair shop testified before a grand jury to procure indictments against the shop owner for theft by deception. The shop owner brought an action for abuse of process against the customers. In affirming the dismissal of the claim, the Court of Appeals noted the absence of a crucial element of the shop owner's abuse of process case, stating:

> Although appellees may have had an ulterior purpose in securing the indictments against appellant, the record contains no evidence that appellees attempted to use the indictments against appellant outside the criminal proceeding. If appellees had offered to drop the indictments in return for a release of their debts to appellant, then appellant would have stated a cause of action on his claim for abuse of process.

*Id.* at 952. From that language, Sprint surmises that the "willful act" of coercion must occur after the initiation of the legal process. We are also aware that the commentary accompanying the Restatement (Second) of Torts, § 682 (quoted above) states, "The *subsequent* misuse of the process, though properly

obtained, constitutes the misconduct for which the liability is imposed under the rule stated in this Section." (Emphasis added).

We do not read *Mullins* as having adopted such a rule. The point in *Mullins* is that no evidence of any act occurred, before or after, the issuance of the indictment threatening the use of criminal process in order to extract payment from Mullins. Nor, do we read the Comment to the Restatement (Second) of Torts, § 682 as establishing such a rule. The above Restatement commentary is found amidst the following commentary:

> The gravamen of the misconduct for which the liability stated in this Section [682] is imposed is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish.
>
> . . . .
>
> For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended. The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it.

We find nothing in the text of the Restatement or in any of the cases and treatises cited to us that supplies a compelling rationale for placing great weight on the use of the word "subsequent." It is use of the legal process to coerce compliance with the ulterior purpose, whenever it may occur, that the tort of abuse of process is designed to redress.

We discern a split of authority among the courts of the several other

16

states that have addressed this issue. Both parties have directed our attention to cases from other jurisdictions and to the particular facets of Kentucky decisions that support their respective arguments. While we decline to burden this opinion with a recitation of all those decisions, we have examined our sister states' treatment of the issue against the backdrop of our own experience with abuse of process in Kentucky cases.

We note that in both *Stoll Oil Refining v. Pierce*, 337 S.W.2d 263 (Ky. 1960) and *Williams v. Central Concrete, Inc.*, 599 S.W.2d 460 (Ky. App. 1980) abuse of process was established without an act *subsequent* to the issuance of the process. In *Songer*, we prominently noted that, "The *purpose* for which the process is used, once it is issued, *is the only thing of importance*" and "*the gist of the tort is that they attempted to use it as a means to secure a collateral advantage.*" *Flynn v. Songer*, 399 S.W.2d 491, 494 (Ky. 1966) (quoting W. Prosser, *Prosser on Torts*, § 115 (3d ed. 1964)) (emphasis added). Thus, the timing of the coercive act by which that purpose is expressed is of no critical significance. What is significant is the willful act of employing of a legal process against another to achieve a purpose other than that for which the process was designed and intended.

Other states support the concept that the "willful act" constituting the tort need not occur subsequent to the issuance of the process. In *Mills County State Bank v. Roure*, 291 N.W.2d 1 (Iowa 1980), the Iowa Supreme Court held:

> The existence of this cause of action recognizes that even in meritorious cases the legal process may be abused. That abuse

17

involves using the process to secure a purpose for which it was not intended. We can see no reason why there must be subsequent activity to support the cause of action. Such activity may be very probative in determining the intent to abuse; however, there need not be such a subsequent action to commit the tort. To rule otherwise would protect the tortfeasor when the abuse is most effective - where the issuance of the process alone is sufficient to accomplish the collateral purpose.

*Id.* at 5. The New Mexico Supreme Court, in *Richardson v. Rutherford*, 787 P.2d 414 (N.M. 1990) followed the Iowa precedent, noting, "[w]hile a subsequent act may suffice to prove an abuse of process which was appropriate when issued, it is not an essential element. The initial use of process itself may constitute the required overt act under the facts." *Id.* at 421. *See also Maniaci v. Marquette University*, 184 N.W.2d 168 (Wis. 1971) (Use of mental health commitment process to detain victim so that her parents could be notified of her intent to leave the university established prima facie case of abuse of process).

Thus, we conclude, from the weight of Kentucky jurisprudence and the persuasive authority expressed by the courts of other states, that abuse of process *does not* require that the willful, coercive act occur subsequent to the issuance of the process.

Sprint contends that it was entitled to summary judgment because the evidence could prove only that it "simply employed the judicial process to achieve its authorized end: condemnation of Leggett's land in order to expand its POP facility," and that in so doing, it "did nothing more than carry out the

18

process to its authorized conclusion." However, the evidence presented creates a material question of whether Sprint did more than that. First, there is evidence that Sprint went beyond the simple filing of a lawsuit – it threatened Leggett that unless he sold Sprint his entire property, it would take his land and force him to suffer "the rigors of contest and associated unpleasantries" of a condemnation suit. Second, there is evidence that Sprint abused its power of condemnation by filing a lawsuit that grossly overstated its authority to condemn property in an effort to induce Leggett to negotiate more generously than had been his prior inclination for the sale of an interest in his land that Sprint had no power to acquire by legal process. We see no reason to treat the matter differently, depending only upon whether Sprint threatened Leggett with costly "rigors and unpleasantries" before or after it filed the suit. Either way the legal process was employed to achieve a purpose for which it was not intended - to enable Sprint to obtain complete, fee simple control of Leggett's property. Therefore, summary judgment for Sprint was improper.

To be clear, this opinion does not expose the risk of an abuse of process lawsuit, to one who engages in pre-litigation settlement negotiations, and, with an eye toward encouraging an agreement, merely reminds the opposing party of the "rigors and unpleasantries" of litigation. Nor, does this opinion hold that simply filing a groundless lawsuit constitutes an abuse of process. But, just as we find abuse of process as an improper threat to continue the prosecution of an ongoing claim unless a concession is made on a collateral matter (as in

19

*Mullins*, 705 S.W.2d 951), we find it no less of an abuse of process to initiate a legal action for an improper purpose (demanding a result not authorized by applicable law) after threatening to do so unless the unauthorized result is granted.

Because Leggett has evidence available for use at trial to establish the elements of abuse of process, the Court of Appeals properly reversed the summary judgment.

### B. Leggett's Proof of Damages

Sprint finally asserts that summary judgment on the abuse of process claim was appropriate because Leggett can not show compensable damages. We disagree. If upon remand, Leggett's evidence of abuse of process is persuasive, he is entitled to at least nominal damages. *Stoll Oil Refining*, 337 S.W.2d at 266. Moreover, upon proper showing, exemplary or punitive damages are recoverable for abuse of process. *Central Concrete Inc.*, 599 S.W.2d, at 461. Leggett has sufficiently pled the existence of compensatory damages in the form of attorney's fees and litigation expenses incurred as a result of improper use of process, should he prevail on that claim. Generally, attorney fees are not recoverable, but may be recovered after the successful defense of a condemnation proceeding when the trial court, in the exercise of its sound discretion, determines that the condemning authority acted in bad faith. *Golden Foods, Inc. v. Louisville & Jefferson County Metropolitan Sewer Dist.*, 240 S.W.3d 679, 683 (Ky. App. 2007). Thus, Sprint was not entitled to

20

summary judgment on Leggett's abuse of process claim on the grounds that Leggett has no compensable damages.

### III.  LEGGETT'S CLAIM UNDER 42 USC § 1983

Sprint next claims that the Court of Appeals erred in reversing the summary judgment dismissing Leggett's civil rights claim under 42 USC § 1983.[5]  As we noted above, the trial court dismissed Leggett's civil rights claim without elaboration.  The Court of Appeals reversed the trial court's ruling on the grounds that Leggett's evidence sufficiently raised an issue of fact as to whether Sprint attempted to deprive Leggett of his property rights under color of state law.  Sprint's only challenge to that decision is that since Leggett cannot establish a valid claim under state law for abuse of process, his corresponding claim under 42 USC § 1983 must likewise fail.  Obviously, we disagree with Sprint's premise that Leggett cannot establish an abuse of process claim.  While we do not hold that the survival of the abuse of process claim assures the survival of the civil rights claim, in the absence of any compelling argument to do otherwise, we affirm the Court of Appeals' decision remanding the civil rights claim to the trial court for further proceedings.

### IV.  DISCOVERY

The Court of Appeals affirmed the trial court's limitation of Leggett's access to discovery documents produced by Sprint.  Leggett challenged on

---

[5] Even though Sprint is a private entity, when it exercises the power of eminent domain delegated to it by the state, it is deemed to be a state actor subject to suit under 42 U.S.C. § 1983.  *See Jackson v. Metropolitan Co.,* 419 U.S. 345, 352-353 (1974).

appeal the trial court order shielding certain materials from discovery because of the attorney-client privilege. After an *in camera* review, the trial court specifically held:

> [T]he documents submitted . . . are privileged and shall not be discovered and that the discussions between the employees (or contract employees) of SprintCom regarding the litigation in this case is [sic] hereby protected from discovery. However, Plaintiff is allowed discovery, via depositions, to acquire information/facts as to what Defendant relied upon and why it was relied upon concerning and proceeding [sic] the filing of the verified Petition herein.

As depositions were scheduled and taken, additional disputes over the proper scope of discovery persisted. Leggett argued that the privileges Sprint invoked had, in at least some instances, been waived by voluntary disclosure, inadvertent or otherwise. In the meantime, each party filed motions for summary judgment. Before ruling on the issue of waiver of privilege, the trial court entered summary judgment dismissing the case, thereby rendering moot any remaining questions of evidentiary privilege and waiver.

The Court of Appeals, after its own examination of the sealed documents, affirmed the trial court's finding of privilege, but did not address Leggett's argument that the waiver issue had not been considered by the trial court. This issue is preserved by Leggett's cross-petition for discretionary review.

We do not disagree with the determination that the specific documents reviewed *in camera* are subject to an evidentiary privilege. But we agree with Leggett that the question of whether the evidentiary privilege was waived was

not addressed by either lower court, despite being properly raised. Thus, upon remand of this matter, Leggett is entitled to a determination by the trial court of whether waiver of privilege applies with respect to the documents in question, and with respect to discovery materials otherwise sought. Accordingly, we reverse the Court of Appeals' ruling barring disclosure of the documents and remand that matter to the trial court for further review with respect to the waiver claim.

Additionally, we note the trial court's discovery order quoted above seems inconsistent. It is difficult to ascertain how to reconcile the trial court's finding that privileged "discussions between [Sprint's] employee . . . regarding the [condemnation] litigation" were to be protected from discovery with the additional ruling that Leggett should be allowed "discovery . . . to acquire information/facts as to what [Sprint] relied upon and why it was relied upon concerning [the condemnation action]. Recognizing that the reversal of the summary judgment and the elimination of the malicious prosecution claim may, upon remand, alter the landscape of discoverable matters, we presume the trial court will revisit the scope of discovery as it considers the issues of privilege and waiver of privilege, and make such findings, with regard thereto as in the exercise of its discretion, it deems appropriate.

## CONCLUSION

For the reason set forth above, we affirm the decision of the Court of Appeals reversing the summary judgment granted on the claims of abuse of

23

process and violation of civil rights under 42 USC § 1983, and we reverse the decision of the Court of Appeals with respect to the discovery of privileged documents.

This matter is remanded to the Jefferson Circuit Court for further proceedings consistent with this opinion.

Cunningham, Noble, Schroder and Scott, JJ., and Special Justice Kevin Garvey and Special Justice John Grise, concur. Minton, C.J. and Abramson, J., not sitting.

COUNSEL FOR APPELLANT/CROSS-APPELLEE:

Stuart E. Alexander, III
Kathleen M. Winchell Schoen
William J. Walsh
Tilford, Dobbins, Alexander, Buckaway and Black, LLP
401 West Main Street
Suite 1400
Louisville, Kentucky 40202


COUNSEL FOR APPELLEE/CROSS-APPELLANT:

Oliver Grant Bruton
Middleton Reutlinger
2500 Brown and Williamson Tower
401 South Fourth Street
Louisville, Kentucky 40202-3410