

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD85625 |
| v. | ) | |
| | ) | OPINION FILED: |
| CHAD J THOMAS, | ) | DECEMBER 12, 2023 |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Saline County, Missouri**
The Honorable Dennis Allen Rolf, Judge

Before Division Two:  Gary D. Witt, Chief Judge, Presiding, Alok Ahuja, Judge and
Mark D. Pfeiffer, Judge

Chad J. Thomas ("Thomas") appeals the judgment of the Circuit Court of Saline

County, Missouri ("trial court") convicting him, following a jury trial, of one count of

possession of a controlled substance, section 579.015, and one count of unlawful

possession of drug paraphernalia, section 579.074.[1]  Thomas was sentenced to ten years'

imprisonment on count I, and ordered to pay a fifty-dollar fine on count II.  On appeal,

Thomas claims the trial court clearly erred in overruling Thomas's objections to allowing

the jury to hear evidence of an illegal search, in violation of his rights to due process and

---

[1] All statutory citations are to the Revised Statutes of Missouri (2016) as updated
through the 2021 supplement.

fair trial under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  We reverse the judgment and sentence of the trial court and order the defendant discharged.

## Factual and Procedural Background[2]

On February 2, 2021, at 12:30 a.m.,[3] a law enforcement officer ("Officer")[4] pulled Thomas over for driving with an inoperable passenger's side headlight.  Officer approached the vehicle from the passenger side and asked Thomas to roll down his window.  Thomas rolled down the passenger side rear window and when asked, rolled the front passenger window down a few inches.  Officer informed Thomas why he was stopped and asked to see Thomas's driver's license.  Thomas began searching his wallet for his driver's license.  Thomas could not find it so, one minute after the stop, Officer asked Thomas to step out of the vehicle.  Once out of the car, Officer asked for permission to do a protective pat down of Thomas, to which he consented.  During the pat down, Officer felt a small bulge in the pocket of Thomas's hoodie jacket and asked Thomas what it was.  Thomas was not sure what the object was, but thought it could be a "sharp" and indicated he sometimes carries a knife.  Officer repeatedly asked Thomas if he could reach into Thomas's pocket to get it, but Thomas declined.  Officer was eventually allowed to look in the pocket and confirm the object was a key fob, two minutes and forty-five seconds after the stop.

---

[2] This Court views the facts and any reasonable inferences in the light most favorable to the trial court's ruling.  *See State v. Daggett*, 575 S.W.3d 799, 800 n.1 (Mo. App. W.D. 2019).

[3] The traffic stop began at 12:30 a.m.; however, the bodycam footage is incorrectly timestamped, showing the time to be 6:30 a.m.

[4] Pursuant to section 509.520 (2023) we do not use witness names in this opinion.

After the pat down was completed, Officer asked Thomas to sit in his patrol vehicle, but Thomas refused, asserting he was okay right where he was. Officer repeated his request which Thomas continued to refuse. Officer asked Thomas "What's the deal here," to which Thomas replied, "You tell me." Officer and Thomas began discussing Thomas's behavior, and Officer told Thomas he seemed overly nervous and he was talking pretty fast. Thomas indicated he had previously been beaten by an officer and so he was nervous. Officer asked again if Thomas had his driver's license on him. Thomas asked if Officer could just look him up, but Officer stated he preferred to see Thomas's driver's license.

While standing outside Thomas's vehicle, Officer asked Thomas again to sit in the patrol car and Thomas again refused. Officer told Thomas that he was operating a vehicle without a driver's license, and Thomas stated he had a valid Missouri driver's license and it was probably in the center console of his car. Five minutes after the stop, Officer permitted Thomas to go back to the car to retrieve the license. With Officer following, Thomas got into his car, sat in the driver's seat, and appeared to reach to close the door. Officer stopped him and told Thomas he was allowed to get his driver's license, not to get back into the vehicle. While in the car, Thomas turned his body towards the center console and began reaching into the console which prompted Officer to place his hand on Thomas's shoulder to pull him out of the car. Thomas got out of the car. This was five minutes and thirty-three seconds after the stop. Officer immediately radioed to "upgrade" the stop's status and told Thomas to get up against the vehicle because Thomas appeared to be trying to hide something in the console. Thomas denied concealing anything from Officer. Officer put Thomas in handcuffs further detaining him. Six minutes and forty-five seconds

3

after the stop, additional police cars arrived on the scene with additional officers, and Officer placed Thomas in the front seat of his patrol car. While Thomas was detained in the patrol car, Officer debriefed two other officers that had arrived on the scene about why Thomas was being detained.

Officer returned to his patrol car and began asking Thomas identification questions about where he was coming from and going to. Thomas continued to reiterate that his driver's license was in the center console of his car. Another officer opened the patrol car passenger's side door; Officer asked Thomas if another officer could look in the center console for the driver's license and Thomas agreed, asserting that the officers were not allowed to search anywhere else in the car. Seconds later Thomas revoked this limited consent to search the console of the vehicle. Nine minutes after the stop, and immediately after Thomas revoked his consent to search, Officer radioed to check on the availability of the K-9 unit.

Dispatch informed Officer the K-9 was en route ten minutes and twenty-five seconds after the stop. Thomas provided Officer with his identifying information, and Officer radioed dispatch for a license and warrant check. Over the radio, Officer confirmed Thomas's identification, that he was forty years of age and had a valid Missouri driver's license, and learned there was an active warrant for Thomas out of the city of Independence for unpaid fines. The record is unclear as to whether this was Independence, Missouri, or Kansas, as both are referred to at different times. This distinction is immaterial to the outcome of the case. Twelve minutes after the stop, Officer got out of the patrol car to again speak with the other officers and when asked, "How many tickets can you write?" he

4

responded, "none". He later stated he could write a ticket for no driver's license but could not for the headlight because Thomas had not been aware the light was out. For a period of four minutes, Officer remained outside of his vehicle and spoke to the other officers on the scene, including discussion of some prior damage that had been caused by Officer to his patrol car and other conversations unrelated to the traffic stop. Thirteen minutes after the stop, one of the other officers, referring to the warrant, stated to Officer, "Wait on confirmation. Wait on confirmation first. Then you can start scratching tickets. By that time the K-9 should be here." Officer remained outside of the vehicle and continued discussing Thomas's conduct with the other officers. A new officer arrived on the scene, and Officer again discussed the events throughout the stop.

Fifteen minutes and thirty-six seconds after the stop, Officer received confirmation that there was an active arrest warrant for Thomas, but it was not to be served because of COVID -19 restrictions. Sixteen minutes after the stop, Officer got back in the patrol car with Thomas. Officer informed Thomas he was getting a ticket for operating the vehicle without a driver's license in his possession. Officer began to write the ticket sixteen minutes and twenty-seven seconds after the stop. Officer looked up information on his in-car computer, including Thomas's address, to fill out the ticket. Officer stopped writing the ticket when he heard a radio report that the K-9 officer was arriving on the scene. Officer got out of his car as the K-9 officer was arriving and proceeded to debrief the K-9 officer. Outside of the vehicle Officer completed writing Thomas's ticket on the trunk lid of the patrol car in less than fifteen seconds. As he was completing writing the ticket, the K-9 sniff occurred, which was twenty-two minutes after the initial stop. The K-9 alerted

5

on the car and jumped straight into the front seat of the vehicle because the driver's door was left open from when Thomas was removed from the car after searching for his license. Once the K-9 was placed back into its patrol car, Officer informed Thomas that he was going to search his vehicle because the dog alerted, giving him probable cause to search. When searching Thomas's car, Officer found a brown drip bottle and a pipe, and another officer found an uncapped hypodermic needle. This occurred twenty-six minutes after the stop. The evidence was sent to the Missouri State Highway Patrol crime laboratory for testing, and methamphetamine was identified in the hypodermic needle and drip bottle.

Thomas was charged with one count of possession of a controlled substance as a prior offender, section 579.015, and one count of unlawful possession of drug paraphernalia, section 579.074. On January 13, 2022, Thomas filed a motion to suppress, arguing all drugs and contraband found in his vehicle should be excluded from evidence as it was found as a result of an unlawful search and seizure. Thomas argued the officers conducted an illegal search and seizure of his vehicle. On February 11, 2022, the trial court denied Thomas's motion to suppress. The trial court found Officer did not wrongfully extend the traffic stop, because any extension was caused by Thomas's actions during the stop. The trial court noted that the K-9 hit on Thomas's vehicle occurred approximately twenty-two minutes after the initial stop of Thomas and at the same time Officer completed writing the traffic citation. The trial court acknowledged that even if the detention was extended beyond the time necessary to write the citation, based on Officer's conversations with and observations of Thomas, Officer developed reasonable suspicion which justified

6

him extending the detention past the time necessary to complete the stop and to have the K-9 sniff the vehicle.

Prior to Officer's testimony at trial, Thomas renewed his motion to suppress the evidence obtained from the search of his vehicle. Thomas noted he would object to any mention of any testimony Officer gave about the search of the vehicle, the objects discovered, and the lab results. Thomas also requested a standing objection, to which the State did not object. Thomas made several objections throughout the trial when other officers testified about the vehicle search and the items discovered in the vehicle. The objections were overruled, and the evidence was presented to the jury. The jury found Thomas guilty of both charges.

Thomas filed a motion for new trial reasserting the search of his vehicle was unconstitutional and any evidence from the vehicle should have been excluded at trial. On April 4, 2022, the trial court denied Thomas's motion for new trial. Thomas was sentenced to ten years' imprisonment on count I and ordered to pay a fifty-dollar fine on count II. This appeal follows.

## Standard of Review

The State asserts Thomas's point relied on is insufficient under Rule 84.04,[5] and thus, Thomas failed to preserve anything for our review. Rule 84.04(d) requires each point relied on to identify the trial court action the appellant challenges, concisely state the legal reasons for the claim of reversible error, and explain why those legal reasons support the claim of reversible error. Compliance with Rule 84.04 is mandatory. *Lexow v. Boeing Co.*, 643 S.W.3d 501, 505 (Mo. banc 2022). While, "this Court prefers to reach the merits of a case, excusing technical deficiencies in a brief, it will not consider a brief so deficient that it fails to give notice to this Court and to the other parties as to the issue presented on appeal." *Id.* (internal citation and quotation marks omitted). The State argues that Thomas's point relied on fails to specifically identify what evidence was admitted at trial that was improper. Thomas's point relied on states a challenge to the items seized as a result of the illegal search of his vehicle. There was no question before the trial court which evidence he was challenging and there is no question from the briefing, exactly what evidence Thomas is challenging before this court. Thomas's point relied on substantially complies with Rule 84.04 as it gives notice to this court and the State the issue presented on appeal. We exercise our discretion and address this case on the merits.

On appeal, Thomas argues the trial court clearly erred in overruling his objections and allowing the jury to hear evidence of an illegal search and the items seized. When reviewing the trial court's denial of a motion to suppress, we consider the evidence

---

[5] All rule references are to the Missouri Supreme Court Rules (2023).

presented both at the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's decision. *State v. Hosier*, 454 S.W.3d 883, 891 (Mo. banc 2015). "We view the facts and inferences in the light most favorable to the trial court's finding, and we will reverse only if we are left with a definite and firm belief that a mistake has been made." *State v. Haneline*, 670 S.W.3d 14, 22 (Mo. App. W.D. 2023) (internal citation omitted). While we defer to the trial court's determinations of witness credibility and factual findings, the question of whether the Fourth Amendment has been violated is an issue of law that we review *de novo. State v. Scherrer*, 673 S.W.3d 899, 914 (Mo. App. E.D. 2023); *State v. Swartz*, 517 S.W.3d 40, 48 (Mo. App. W.D. 2017).

## Analysis

Thomas argues the trial court clearly erred in overruling his objections to allowing the jury to hear evidence from the search because the evidence presented at trial was fruit of the poisonous tree after an illegal search was conducted, and such evidence should have been excluded from trial. We agree.

The Fourth Amendment of the United States Constitution protects people against unreasonable searches and seizures.[6] U.S. Const. amend. IV. It is well established that a routine traffic stop based on a traffic violation is a justifiable seizure under the Fourth Amendment. *State v. Stoebe*, 406 S.W.3d 509, 514 (Mo. App. W.D. 2013). A dog sniff

---

[6]"The Missouri [C]onstitution offers the same level of protection; the same analysis applies to cases under the Missouri Constitution as under the United States Constitution." *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005).

conducted during a lawful traffic stop does not violate the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 410 (2005). However, if the dog sniff prolongs the initial traffic stop beyond the time reasonably required to investigate and complete the stop's mission it is unlawful. *Rodriguez v. U.S.*, 575 U.S. 348, 357-58 (2015).

A police officer's reasonable investigation of a traffic stop may include the officer "asking for the driver's license, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." *State v. Goucher*, 580 S.W.3d 625, 631 (Mo. App. W.D. 2019). "An officer may continue to detain the individual beyond the time period necessary to investigate the traffic violation if the officer develops reasonable and articulable grounds for suspicion of illegal activity based on the behavior and responses of the individual during the traffic stop." *State v. Stover*, 388 S.W.3d 138, 149 (Mo. banc 2012) (internal quotation marks and citation omitted). In determining whether the standard for reasonable suspicion has been met, a court must consider the totality of circumstances in light of the facts confronting the officer at the time of the stop. *See Stover*, 388 S.W.3d at 149; *State v. Kempa*, 235 S.W.3d 54, 62 (Mo. App. S.D. 2007).

Thomas argues the trial court clearly erred in admitting evidence from the search because Officer unlawfully delayed the traffic stop, and there was no reasonable suspicion for Officer to do so. Thomas asserts Officer's reasonable investigation concluded when Officer received confirmation that Thomas had an active warrant, but the jurisdiction that issued the warrant did not want it to be served, and the stop was extended beyond this point when Officer debriefed other officers on the scene while Thomas was detained. We find

10

Officer extended the traffic stop beyond the time period necessary to investigate the traffic violation, and there was no reasonable suspicion for doing so.

Although Officer pulled Thomas over for an inoperable headlight, the traffic stop properly shifted into an investigation as to whether Thomas was operating his car without a valid license. Several minutes of the traffic stop included: Thomas searching his wallet for his license and he and Officer discussing the possible location of Thomas's driver's license; Officer asking Thomas to sit in his patrol car; Thomas declining; and Officer commenting on Thomas's behavior. Thomas stated his license was in the center console of the car, so Officer gave him permission to go back to retrieve it. When Thomas headed back to the car, he sat in the front seat and turned his body toward the center console so that his back was facing Officer. At this point, concerned that Thomas was attempting to hide something or trying to obtain a weapon, Officer removed Thomas from the car, upgraded the stop's status over the radio, and detained Thomas by placing him in handcuffs. Officer then placed Thomas in the front passenger's seat of Officer's patrol car. At trial, Officer testified he could not see what Thomas was reaching for, and Officer testified he "felt [Thomas] was possibly reaching for a weapon, so [he] felt it necessary to go ahead and remove [Thomas] from the vehicle."

Eight minutes after the stop, Thomas provided his name and identifying information including his date of birth to Officer, which he wrote down in his notebook. Eight minutes and thirty-eight seconds after the stop, Thomas gave another officer permission to look in the console of his vehicle for the license but then immediately recanted that consent. Nine minutes after the stop, Officer requested the K-9 unit. Officer then radioed Thomas's

11

identifying information to dispatch and was informed of a municipal warrant for Thomas's arrest for unpaid fines. Twelve minutes after the stop, Officer got back out of his patrol car and began talking with the other officers on the scene. While Officer was talking to the other officers on the scene, one officer suggested he should wait to confirm the warrant before he started writing the tickets, because by that time the K-9 officer should have arrived. Officer did just that and remained outside of the patrol car for four minutes conversing with the other officers, some of which conversation had no bearing whatsoever on the stop of Thomas. Officer was notified that the jurisdiction that issued the municipal warrant did not want the warrant served based upon COVID-19 restrictions fifteen minutes after the stop. Sixteen minutes and thirty seconds after the stop, Officer began writing Thomas the traffic ticket; however, he stopped writing when dispatch notified him the K-9 unit was arriving on the scene. Officer took time to wait for the K-9 handler to stop and get out of his car, and then Officer debriefed him before completing the ticket. Officer proceeded to complete writing the ticket on the trunk of his patrol car, which took less than fifteen seconds. The total combined time Officer spent filling out the traffic ticket was less than four minutes but was interrupted by four minutes of discussions with the other officers.

"In determining whether a traffic stop extends too long to be justified as investigatory, courts examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Stover,* 388 S.W.3d at 149. Once Thomas was stopped, Officer determined fairly quickly that Thomas was unaware of the problem with his headlight and that he would not give Thomas a citation for that offense. However,

12

he began an investigation as to whether Thomas had a valid driver's license. Officer began asking Thomas identification questions to confirm his identity and license status with the dispatcher. All of this was reasonable and proper investigation.

"[A] routine traffic stop is not concluded until the warning or citation is issued." *Kempa*, 235 S.W.3d at 61. However, Thomas asserts Officer purposely delayed writing the ticket to ensure there was time for the K-9 unit to arrive on the scene. Further, Thomas asserts the trial court erred when it found there were reasonable and articulable grounds for suspicion of criminal activity that justified extension of the stop.[7] We find there were no reasonable and articulable grounds for suspicion to justify extension of the stop.

After the stop for the headlight violation Officer quickly determined that Thomas was unaware that the light was not working and acknowledged that the offense required the driver's knowledge, so he was not going to issue a citation for that offense. However, Thomas was unable to produce a valid driver's license, and it was reasonable for Officer to investigate the identity of the driver, the status of the driver's license to operate a vehicle, and to determine if there were any outstanding warrants for the driver. The process of the investigation of these matters reasonably delayed the completion of the traffic stop. Officer attempted to allow Thomas to produce a driver's license, but Thomas was unable to do so. Thomas asserted that he did have a license and indicated it was probably located in the

---

[7] In the trial court's order denying Thomas's motion to suppress, it stated that even if the duration of the stop extended beyond the time necessary to issue the traffic citation, Officer "developed reasonable suspicion which justified him extending the detention past the time necessary to complete the stop and to have a drug dog complete a sniff of the vehicle." The trial court did not indicate on which specific facts it based its conclusion that Officer had reasonable suspicion.

console of the vehicle. Officer acted reasonably in trying to obtain the license to confirm Thomas's identity and the validity of his license. First, Officer allowed Thomas to search his wallet for the license. When it could not be located in his wallet, Thomas indicated it was probably in the console of the vehicle. Thomas turned his body away from the officer to look into the console, which placed Officer in fear for his safety or indicated that Thomas was concealing something, because his body blocked Officer's view of what Thomas was reaching for in the console. While it does not appear from the video that Thomas was attempting to do anything other than look into the console, it was reasonable for Officer to remove him from the vehicle for his safety.[8] Officer then requested permission to search the console for the license, but that was denied. At that point, Officer had Thomas provide his identifying information so Officer could attempt to confirm his identity through dispatch. Officer conceded the investigation of Thomas's broken headlight and lack of identification was complete once Officer verified Thomas's identity. This entire process took approximately twelve minutes. While this may be longer than would be required for a normal traffic stop, it was not unreasonable under these circumstances. Further, at this point Officer was notified there was an outstanding municipal warrant for Thomas's arrest for unpaid traffic fines. Officer points to no reason why he needed to wait for confirmation of the warrant before he began writing the unrelated ticket for the license violation. Fifteen

---

[8] The passenger compartment of the vehicle was small, and the console on the vehicle was also small and located near the back of the front seat, requiring someone sitting in the driver's seat to turn their body to see inside of it. Thomas acted reasonably in turning to look into the console in an attempt to find the missing license, but Officer also acted reasonably in removing Thomas from the vehicle in that he could not see if Thomas was reaching for a weapon or concealing something in the console.

14

minutes after the stop Officer began writing the traffic ticket. However, the writing of the traffic ticket was delayed by four minutes of discussion with the other officers, which was not necessary to the investigation and appeared to be an intentional delay to allow time for the K-9 unit to arrive. It is of concern that another officer on the scene *specifically suggested to Officer that he delay the writing of the traffic ticket until the warrant issue was resolved, because that would allow more time for the K-9 unit to arrive.* Officer remained outside the vehicle carrying on the conversation even though he stated to other officers that he was "freezing" during a period when he could have been in his heated patrol car writing the ticket.

While Officer began writing the ticket, Officer stopped writing when the K-9 unit arrived. By that point, Officer had filled out most of the ticket, but he did not complete it. The K-9 officer alerted to the presence of illegal drugs twenty-two minutes after the stop and seven minutes after Officer began writing the traffic ticket. At trial, Officer testified he could have finished writing the ticket but decided not to in order for the K-9 to sniff the vehicle. The decisions not to begin writing the traffic citation while awaiting confirmation of the status of the municipal warrant, to get out of the patrol car and discuss issues with the other officers during what appears to be a relatively routine traffic stop, and to cease writing the ticket when he learned the K-9 officer was about to arrive resulted in an unreasonable extension of the traffic stop, because Officer had completed his reasonable investigation for the traffic violation, and thus should have ended the stop by issuing

15

Thomas his citation.[9] *See U.S. v. Cox*, 992 F.3d 706, 710 (8th Cir. 2021) ("[A] seizure justified only by a police-observed traffic violation, . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation[.]") (internal citation omitted).

**Grounds to Extend Traffic Stop**

Officer was allowed to detain Thomas beyond the time period necessary to investigate the traffic violation so long as he developed "reasonable and articulable grounds for suspicion of illegal activity based on the behavior and responses of [Thomas] during the traffic stop." *Stover*, 388 S.W.3d at 149 (internal quotation omitted). "Reasonable suspicion is present when a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *State v. Lovelady*, 432 S.W.3d 187, 191 (Mo. banc 2014) (internal citation and quotation marks omitted).

The State asserts Officer had sufficient reasonable suspicion to continue to detain Thomas because Thomas was overly nervous and exhibited evasive behavior, he was sweating when it was cold outside, he appeared to be concealing something from Officer, there was an active arrest warrant for him, and Thomas told Officer he may have a "sharp" in his pocket during the protective pat down. The State asserts these combined factors

---

[9] At the suppression hearing Officer acknowledged that he could have completed writing the citation rather than ceasing writing to get out of the patrol car, wait for the K-9 unit to finish arriving on the scene, and briefing the K-9 handler prior to completing the citation.

16

provide a minimal level of objective justification for Thomas's further detention. We disagree.

At the time of the traffic stop, Officer had been working with the police department for only a few months and this was his first law enforcement job after completing the police academy. Officer testified that based on the totality of circumstances, he believed there was further criminal activity beyond the normal traffic stop. At the suppression hearing, Officer testified that he had "clues" that further criminal activity was afoot, but acknowledged he had no "reasonably articulable facts" of any additional criminal activity. At trial, Officer asserted Thomas seemed nervous, exhibited evasive behavior, was sweating even though it was cold outside, and would not roll his window down all the way. *See Kempa*, 235 S.W.3d at 62 ("[E]xcessive nervousness by itself cannot create reasonable suspicion, but that factor can be considered . . . in determining whether the totality of circumstances supported the existence of reasonable suspicion."). Officer called in to check on the availability of the K-9 unit immediately after Thomas gave his consent but quickly revoked it for another officer to search the center console of his vehicle for the driver's license. At the suppression hearing Officer testified, "I asked him if he had anything illegal in the vehicle. He said no. I asked him if he was denying consent to search his vehicle, and he said yes. And I called for a K-9 officer." "The withdrawal of consent may no more be used to create reasonable suspicion of criminal wrongdoing than an initial refusal to consent to a search." *State v. Hayes*, 51 S.W.3d 190, 194 (Mo. App. W.D. 2001); *State v. Slavin*, 944 S.W.2d 314, 319 (Mo. App. W.D. 1997) ("[A] refusal to consent to a

17

search may not be used as support for the requisite reasonable suspicion to support the search.").

However, "[t]he officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *State v. Crabtree*, 398 S.W.3d 57, 60 (Mo. App. W.D. 2013) (internal quotation marks omitted). At trial, Officer agreed that the decisions he made based on his training and experience were similar to "a hunch." Officer testified that he did not see any weapons, he did not see or smell any drugs during the stop, and Thomas did not appear to be impaired or under the influence of drugs. While Officer noted that Thomas failed to roll his window all of the way down, Officer noted the extreme cold that evening. Officer did not detect any odor of drugs or alcohol or any other reason why the failure to roll the window the rest of the way down was suspicious. Thomas acknowledged to Officer he was nervous during the stop, but he explained his nervousness was because of a bad experience with another officer in the past. While Thomas declined to sit in Officer's patrol car, he was otherwise cooperative throughout the encounter. Thomas did not hesitate to get out of the car when initially asked, and he did not resist being detained by Officer or placed in handcuffs. Further, Thomas gave Officer consent to do a protective pat down of his person when initially pulled over and asked to get out of his vehicle. Early on in the stop, Thomas suggested Officer could look him up, but Officer declined because he preferred to have Thomas's physical license.

The State points out the other officers at the scene described Thomas as loud, argumentative, and agitated, but the actual video of the encounter does not support this testimony. Thomas was cooperative with Officer as shown by him answering Officer's

18

questions about where he was going and coming from, and he provided Officer with accurate identifying information. At various times throughout the traffic stop, Officer and Thomas were bickering with one another about whether Thomas had a license and the events that led to Thomas being detained in handcuffs. However, at one point, Thomas joked with the Officer about gaining weight and suggested Officer should put a mask on since Thomas may have been exposed to COVID-19.

Officer did not testify that the possible concealment of something in the console, the warrant, or the potential "sharp" in Thomas's pocket were factors he considered when determining there was further criminal activity beyond the traffic stop. However, the State asserts these are additional factors, when considered in the totality of circumstances, which provided a minimal level of objective justification for Thomas's further detention. We disagree.

Our courts "evaluate reasonable suspicion based on an objective assessment of the officer's actions in light of the facts known to him at the time." *State v. Selvy*, 462 S.W.3d 756, 768 (Mo. App. E.D. 2015). The State asserts concealment by a defendant can provide an officer with reasonable suspicion, citing to several cases. The concealment in these cases was coupled with other behavior which made it apparent the defendant was trying to hide something illegal from the officers.[10] That is not the case here. While Officer testified

---

[10] *See State v. Waldrup*, 331 S.W.3d 668, 673 (Mo. banc 2011) (defendant's demeanor noticeably changed as he spotted troopers at a checkpoint and he ducked far into the floorboard to grab or hide something); *State v. Deck*, 994 S.W.2d 527, 535 (Mo. banc 1999) (defendant's first reaction with officer was him turning away and reaching down toward the passenger side as if he was grabbing or attempting to hide something); *State v. Lanear*, 805 S.W.2d 713, 717 (Mo. App. W.D. 1991) (officer approached a parked car in

he believed Thomas may have been concealing something from him, he testified that his decision to pull Thomas out of his vehicle was "just a safety thing," because he thought Thomas "was possibly reaching for a weapon." Officer did _not_ suggest that he interpreted Thomas's conduct as an effort to conceal or destroy evidence of a crime, or that any further investigation or response was necessary beyond simply removing Thomas from the vehicle. Thomas's behavior and responses in their totality do not suggest the sort of potential concealment of evidence that was presented in the cases the State has cited. While seated in the driver's seat of the small car, it would have been difficult, if not impossible, for Thomas to have searched the small console for his license without turning his back on Officer to look into the console.

Similarly, the State points to Thomas's active warrant. "[W]hile criminal history cannot form the sole basis to determine reasonable suspicion, it can certainly be one of the factors in a criminal activity analysis." *See State v. Smith*, 373 S.W.3d 502, 506 (Mo. App. S.D. 2012) (internal quotation marks and alterations omitted). While Officer was aware of Thomas's active warrant for unpaid fines in a municipal court, we do not believe this coupled with the other facts presented amounted to reasonable suspicion. As for the protective pat down, based on his training and experience, Officer believed the object in the hoodie pocket could be a hypodermic needle because Thomas referred to it as possibly

---

a common drug area and men leaning into the car ran while the car occupants appeared nervous and made movements leading officer to believe they were concealing something); *State v. Hunter*, 783 S.W.2d 493, 495 (Mo. App. W.D. 1990) (officer approached a parked car with his lights on and driver lunged toward passenger, passenger ducked down in an apparent effort to hide something, and both returned to upright position).

20

a "sharp," but Officer also testified "it could also be a knife, a razor, just anything sharp in general." However, Officer quickly was able to observe that the object was a key fob to Thomas's vehicle, so this concern was alleviated and no longer existed. Officer's belief that the object was potentially a hypodermic needle was dispelled long before Officer requested the K-9 unit respond to the scene, and thus, this could not reasonably be a factor to consider for reasonable suspicion.

Considering the totality of circumstances presented to Officer, we do not find there was reasonable suspicion to extend the stop to investigate any offense beyond potential traffic violations. Officer failed to conclude the traffic stop within a reasonable time under the totality of the circumstances. This time had expired prior to the K-9 unit's arrival, resulting in an unlawful extension of the stop and illegal search of Thomas's car.

**Application of Exclusionary Rule**

The State asserts that even if we are to find there was a Fourth Amendment violation, the exclusionary rule should not be applied because there would be no deterrence benefit here. We disagree. "The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. U.S.*, 555 U.S. 135, 140 (2009). The exclusionary rule is a judicially created remedy that is designed to deter any future violations of Fourth Amendment rights. *Arizona v. Evans*, 514 U.S. 1, 10 (1995) (citation omitted). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *State v. Wilbers*, 347 S.W.3d 552, 562 (Mo. App. W.D. 2011) (citing *Herring*, 555 U.S. at 135).

Here, Officer deliberately delayed beginning to write Thomas's traffic ticket. Officer did not even begin to write a ticket, although he had completed his investigation of the potential traffic offenses, but instead exited his vehicle to engage in a discussion with other officers that was almost four minutes long, in a case involving routine traffic violations. At another officer's suggestion, Officer chose to wait to receive confirmation about Thomas's warrant before he even began writing the traffic ticket. This was not necessary to the investigation of the traffic stop, and instead was a delay tactic to allow time for the K-9 unit to arrive. The results of the warrant confirmation had no bearing on the charge of operating a vehicle without a license or the ticket for that offense. Rather than write Thomas's traffic ticket, Officer waited for four minutes to receive warrant confirmation and spoke with the other officers on the scene about matters unrelated to Thomas's traffic stop. The fact that the officers' discussion strayed into unrelated matters indicates that the discussion was not necessary to complete the stop, but instead was just "killing time" while awaiting the K-9 unit. In total, it took Officer four minutes to write Thomas's traffic ticket; however, it was interrupted by Officer's deliberate actions in delaying to allow more time for the K-9 unit to arrive. Officer's actions in extending the traffic stop were sufficiently deliberate that exclusion of the evidence from Thomas's vehicle would meaningfully deter future Fourth Amendment violations. *See Herring*, 555 U.S. at 144 ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."); *State v. Grayson*, 336 S.W.3d 138, 147 (Mo. banc 2011) ("Although this exclusionary principle is driven by dual considerations of deterrence and of judicial integrity, the deterrence

22

rationale is paramount: [t]he rule is calculated to prevent, not to repair.") (internal citations and quotation marks omitted). Here, the error does rise to the level needed to permit application of the exclusionary rule. *See State v. Barks*, 128 S.W.3d 513, 517-18 (Mo. banc 2004) (holding evidence obtained after a completed traffic stop should have been excluded because there was no reasonable suspicion to justify defendant's further detention); *State v. Granado*, 148 S.W.3d 309, 312-13 (Mo. banc 2004) (holding evidence obtained from a K-9 sniff should have been excluded as it occurred after a traffic stop concluded and there was no reasonable suspicion justifying defendant's further detention). The evidence obtained from Thomas's car should have been excluded. Since there is no way the State can prove the charges of possession of a controlled substance or possession of paraphernalia against Thomas without the use of the illegally obtained evidence, the judgment is reversed and the defendant is ordered discharged. *See State v. Weddle*, 18 S.W.3d 389, 396 (Mo. App. E.D. 2000).

## Conclusion

For the above stated reasons, we reverse the judgment and sentence of the trial court and order Thomas discharged.

_____
Gary D. Witt, Judge

All concur

23